JOHN STEVENSON AND GEORGE F. MARSH v. THE MICH-IGAN LOG TOWING COMPANY.

*Contract—Towing logs—Liability for loss—Evidence—Principal and agent.*

1. The owners of a tug sued a log-towing company for towing logs. The contract called for a "first-class long raft line." The testimony tended to show that certain other tugs, larger and stronger than the plaintiffs', carried lines from 1,200 to 1,500 feet in length, but that these were exceptional cases. The line used by the plaintiffs was 1,000 feet long. And it is held that what was considered and known as a "first-class long line" was a matter for the jury, and that, in the absence of evidence upon that point, neither the court nor the jury could determine the question.

2. The line parted, causing the loss of certain booms and chains, and expense in recovering the scattered logs, and the defendant sought to recoup for these losses. Plaintiffs identified 500 feet of the line, and gave testimony tending to show that this portion of the line showed the very break itself. And it is held that the plaintiffs were entitled to exhibit to the jury the entire 500 feet of line, and that their application that the jury be permitted to view the same should have been granted.

3. Defendant sent its "log man," so called, to plaintiffs with two letters, in one of which it introduced him as "our log man,"

and stated that any orders from him would be the same as from its office. The other letter directed plaintiffs to take said log man and certain booms, and tow a certain raft to a designated point, and, on arriving there, to wire the defendant for orders. And it is held that the term "log man" is a technical one, and may have a signification limiting the range of the duties of the person to whom it is applied; that, in the absence of such explanation, it cannot be said that the defendant, by said letters, intended to restrict the authority of its log man to matters respecting the booming of the raft and the placing of lights thereon while in transit; that if he had authority to direct the rate of speed of the tug (which plaintiffs claim he assumed to do), and as to what should be done in emergencies, and gave such directions, and the same caused an increased strain upon the line and its parting, and the line was not defective, or if the loss was aggravated by what was done under said directions, the plaintiffs cannot be made to respond in damages therefor.

4. The testimony did not tend to show that said log man had examined the line, or that he was aware of its defects, if any existed. And it is held that it cannot be said that he waived such defects, or that there was such an acceptance by him of the line as relieved plaintiffs from their obligation to furnish a first-class line.

Error to Bay. (Maxwell, J.) Argued November 21, 1894. Decided December 28, 1894.

*Assumpsit.* Plaintiffs bring error. Reversed. The facts are stated in the opinion.

*Hatch & Cooley* (*Harvey D. Goulder*, of counsel), for appellants.

*McDonell & Hall* (*John E. Simonson*, of counsel), for defendant.

McGRATH, C. J. Plaintiffs were owners of the tug Gladiator. On April 5, 1893, they wrote defendant as follows:

"We have the large lake tug Gladiator, commanded by Capt. Robt. Ferguson, a capable and experienced raft tug

man. If you have any raft towing to do this season, we will be pleased to make you figures that will be satisfactory."

On August 3, 1893, defendant sent the following telegram to plaintiffs:

" Give lowest price Gladiator. We furnish fuel; you furnish everything else, including first-class long raft line."

After other correspondence the Gladiator was engaged, and ordered to report to Bay City. On August 21, 1893, defendant sent one Wilds to Bay City with two letters addressed to the captain of the tug. Both had the same date. One read:

" The bearer, Larrie Wilds, is our log man. Any orders from him will be the same as from this office, and I hope you will do your best to work for his and our interest."

The other was as follows:

" Take our man and 130 booms to E. Tawas; get another string booms; clear at Tawas for French river; tow Holland & Emery raft to E. Tawas. Soon as you arrive with raft at E. Tawas, wire here for orders. I hope you will do your best, and work the tug for all is in her."

Plaintiffs sue to recover for tug services under the contract. Defendant insists that, by reason of the failure of the plaintiffs to furnish a first-class towline, the line parted while towing the Holland & Emery raft, causing the loss of certain booms and chains, and large expense in the recovery of the scattered logs, and it claims the right to recoup for these losses. Plaintiffs insist that Wilds in fact managed the transportation; that the line was brought out on deck on the out passage, and Wilds made no objection to its use or complained as to its character; that the line parted in the storm, by reason of the speed of the tug, which was increased by the direction of Wilds; that after the line parted the tug should have made an effort to recover the raft, but the captain was directed by Wilds to leave the raft and go to Tawas. Defendant's testimony

tended to show that a long raft line was 1,200 feet in length; that plaintiffs' towline was but 1,000 feet in length, and was decayed in places. Plaintiffs' testimony tended to show that the line parted in a heavy sea; that, under such circumstances, it was usual to slack the speed of the tug, because of the liability to part the towline or wreck the raft. The engineer testified that—

" He [Wilds] came down in the engine room. He says, ' We are going astern.' Says I, 'I can't help it; she is working as strong as she ought to work.' He says, ' You better work her a little stronger.' Says I, ' You will part your towline.' Says he, ' Oh, no; you can't part that.' Says I, ' Will you take the chances of parting it?' He says, ' Yes; I will take the chances; you can't part it.' I pulled her a little stronger. I told him to go back and look at it. He could get up on the railing that runs around the stern right in front of. the window. I says, ' Get up there and look at that line.' He got up there, and looked at it. He was quite a little while looking at the line. I went around by the throttle, and says, ' Shall I give her some more?' He says, ' Yes; open her out.' So I pulled open the throttle, and he hadn't any more than got on deck when the line parted."

Plaintiffs' testimony further tended to show that the line had not had much use; that a line 1,000 feet in length was regarded as a long line; that the line was a first-class line; that first-class towlines frequently broke under circumstances indicated here; that two or three years on board a tug would not impair a towline, if it had been properly cared for; that it was use that ordinarily affected a line, and that the line had been properly cared for.

The court instructed the jury that—

" Under the contract between the parties, the plaintiffs did not guarantee the safe delivery of the raft. They are not liable as guarantors or warrantors of the absolute safe delivery of the raft, but they must furnish a sufficient line for that purpose, and they are not liable for an extraordinary emergency or accident that happened on the lakes that could not be foreseen or provided against."

They were further instructed:

"A line suitable for that boat ought to be sufficient for her to pull on it with substantially all her might. It appears from the testimony that the progress of these rafts, when she had them, was from nothing, even a retrograde movement, up to a mile or a mile and a quarter an hour. The distance across Lake Huron is some 250 miles, and to make that journey at that rate would take from 8 to 10 days. The line ought to be sufficient to hang on to that boat and that raft through all the perils that were likely to happen on that journey, including storms, head winds, and everything likely to happen, and, unless the line was sufficient for that purpose, the plaintiffs are liable for the consequences of it. * * *

"I am requested to state that the plaintiffs cannot be liable for damages caused by the acts of the defendant or the agent Wilds. The plaintiffs cannot be liable for any damage caused by the acts or directions of the defendant, but the agency of the defendant's man Wilds, so far as it has been proved in this case, is all in the two letters that have been read to you. I charge you that, under the authority in those two letters, he had no authority to modify this contract."

During the trial the court said:

"I don't think I ought to admit any evidence in regard to compliance with the contract; that is, that this line or any other line answers the purpose of the contract. It is purely a question of law what the contract means. It means a long line and a good line."

"If there is in common use on Lake Huron lines varying in length from 800 to 1,500 feet, the contract calls for a long line. It is one of the long class. Not one that is 800 feet long, nor 1,000 feet, but one that is 1,200, 1,400, or 1,500 feet long. That has got to be furnished by the parties, or they must stand the consequences. I shall tell the jury so."

"I shall charge the jury that they were bound to furnish a line that was sufficient to hold all that the Gladiator could pull under ordinary circumstances."

"Yesterday afternoon I announced to the plaintiffs' counsel my opinion that the plaintiffs were liable to furnish a good, long raft line,—a line of sufficient strength to hold all that the tug could pull under ordinary circum-

stances, even during such gales and such weather as was common or frequent on the lakes. This opinion so expressed at the time seemed to me so decisive of the main point in dispute in this case as to render the opinion of witnesses as to the line of no value. Soon after this announcement Mr. Bennett was sworn, and his evidence presented a question equally important as to the authority of Wilds to modify the terms of the contract. I was unable for a while to satisfy myself on the question, and permitted some evidence to be introduced which, in my judgment, ought not to have been received. This hesitation of the court no doubt, on the last question, misled the plaintiffs' counsel, who still persisted in offering testimony that the court regarded as objectionable. I now strike out of the case all the evidence of the witnesses of the recent examination of the different parts of the towline, as not being material to the controversy."

The trial court's instructions to the jury, and the remarks made pending the trial, were clearly erroneous. The telegram did not give either the size or the length of the line. The words "a long line" cannot be arbitrarily construed to mean the longest line in use. There was testimony tending to show that certain other tugs carried lines from 1,200 to 1,500 feet in length, but these were exceptional cases, and the testimony tended to show that the tugs carrying such lines were larger and more powerful than plaintiffs' tug. The object of a long line was to clear the back current made by the wheel, and to avoid any strain upon the line or raft in case of a sea. The more powerful the tug the greater the current, and the heavier the tug the greater would be the strain upon the line and raft. What was considered and known as "a first-class long line" was a matter for the jury, and neither court nor jury could determine the question, in the absence of evidence upon that point.

It would seem that the best evidence of the general condition of the line was the condition of the 500 feet which

103 MICH.—27.

plaintiffs identified, and sought to have the jury view. Defendant's testimony respecting the condition of the line was not confined to the point of the break, but tended to show that it was generally in a state of decay. Even if this were otherwise, plaintiffs testimony clearly tended to show that the part of the line which they sought to exhibit showed the very break itself. Plaintiffs certainly had the right to produce a portion of the line in the court room, but they were denied even that privilege. The best evidence would have been the entire 500 feet, rather than a selected portion. This was not an application to have the jury view premises or the locality of an accident, where the grant is dependent largely upon the discretion of the trial court, but plaintiffs desired to exhibit to the jury a portion of the rope in question, something which was in and of itself real evidence, and the application to the court was made by reason of the bulk of the thing sought to be exhibited. Plaintiffs were entitled to the added weight of the testimony afforded by an exhibit of the entire 500 feet, rather than be subject to a suspicion or charge that a selected portion had been brought in and placed before the jury. The ordinary juror would be enabled, upon examination, to determine whether or not the line at the break was decayed. In any event, there was testimony which would have aided them in that determination, and the court should have granted the application.

Defendant contended that the man Wilds was sent with the tug merely as a log man,—to look after the logs; to see to lights upon the raft; to see that the logs were properly rafted, and the rafts delivered to the tug; and that orders from Wilds necessarily referred to orders in the line of his employment, and not to orders relating to the navigation of the vessel. On the other hand, it is insisted

that the effect of the letter was to notify the captain of the tug that Wilds was a man in whose judgment and skill as a log man the defendant corporation had confidence; that the defendant did not care to trust the matter of the navigation of the raft wholly to the captain of the tug; that Wilds was placed on board the tug as defendant's representative, clothed with the largest possible authority, and that he was so stationed to superintend the matter of the rafting of the logs.    One of the letters sent gives to the captain of the tug explicit directions as to his movements, and includes a direction that on his return to Tawas he should wire defendant for further orders.    The orders which the other letter contemplated must, in the absence of explanation, be deemed to relate to other matters connected with the transportation of the raft.    The special business of defendant was the transportation of rafts.    Log towing was not a mere incident of its business. It was not a rafting, but a log-towing, company.    In view of the nature of the business in which defendant was engaged, the letters do not warrant the construction given to them by the trial court.    The term "log man" is a technical term, and may have a signification limiting the range of the duties of the person to whom applied.    It may be that in the performance of his duties, such as the booming of the logs and the care of the raft, the cooperation of the tug captain was essential, and that the authority conferred related only to such as was necessary to secure that co-operation.    In the absence of such explanation, it cannot be said that by these letters the defendant, a log-towing company, engaged in the navigation of logs, and expert in all matters pertaining to such navigation, intended to restrict the authority of the man Wilds to matters respecting the booming of the raft and the placing of lights thereon while in transit.    If Wilds had authority to direct the rate of speed of the tug, and as to

what should be done in emergencies, and he did so direct, and such directions caused the increased strain upon the line and its break, and the line was not defective, or the loss was in any event aggravated by what was done under his directions, the plaintiffs cannot be made to respond in damages for what was done by the direction of defendant's duly-authorized agent.

The testimony does not tend to show that Wilds had examined the line, or that he was aware of its defects, if any existed. Hence it cannot be said that he waived such defects, or that there was such an acceptance of that appliance as relieved plaintiffs from their obligation to furnish a first-class line.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.