STOTT v. STOTT REALTY CO.

1. PLEDGES—TERMINATION OF PAYMENT OF DIVIDENDS—WAIVER.
   Corporation to which plaintiff had assigned his stock therein and other collateral as security for repayment of his obligation under a loan agreement, in making payments to him out of dividends pursuant to his personal request therefor after its right to terminate such payments because of being subjected to garnishment, did not constitute a waiver of its right to terminate payments to him.

Contractual modification of normal incidents of a pledge, see Restatement, Security, § 14; priority as between one holding pledge to secure future advances and one acquiring subsequent legal interest therein, see Restatement, Security, § 35 (d) ii.
Use of parol evidence rule in case of ambiguity, see 1 Restatement, Contracts, § 233 (a).

2. SAME—PAYMENTS OUT OF DIVIDENDS—ATTACHMENT—GARNISH-
MENT—WAIVER.

  A pledgee who has agreed to make payments out of dividends to
    pledgor upon pledged stock is not bound at its peril to be
    sure that pledgor's other creditors in their proceedings by way
    of attachment, garnishment or levy would ultimately prevail
    against pledgee but is bound by process in such proceedings,
    and where pledge agreement providing for such payments at
    personal direction of pledgor also provided for termination
    thereof by pledgee when absolute control of right to receive
    same by pledgor ceased, pledgee's subsequent payments are
    to be regarded as voluntary and not as a waiver of the right
    to terminate such payments.

3. CONTRACTS—CONSTRUCTION—INTENTION—AMBIGUITIES.

  When parties have reduced their contract to writing, courts will
    construe it according to the intention therein expressed, when
    that intention is clear upon its face, as it is only in cases of
    ambiguity in the terms of a written contract that courts re-
    sort to extraneous evidence to determine the intention of the
    parties.

4. SAME—CONSTRUCTION.

  Where only the contractual rights of the principals to a contract
    are involved and there is no ambiguity in the instrument, that
    interpretation should be given thereto that gives effect to every
    provision contained in the contract.

5. SAME—CONSTRUCTION—NEW CONTRACTS.

  Where there is no ambiguity in the language used in a contract,
    the language used will be confined to its usual and ordinary
    meaning as the courts will not make a new contract under the
    guise of construction because it later appears that a different
    agreement should have been consummated in the first instance.

Appeal from Wayne; Chenot (James E.), J.
Submitted June 15, 1943. (Docket No. 30, Calendar
No. 41,916.) Decided October 11, 1943. Rehearing
denied November 29, 1943.

Assumpsit by Arthur Stott against Stott Realty
Company, a Michigan corporation, for money due.
Judgment for defendant. Plaintiff appeals. Affirmed.

*Shapero & Shapero (Harold M. Shapero,* of coun-
sel), for plaintiff.

*Lewis & Watkins* and *David I. Hubar* (*Milton M. Maddin,* of counsel), for defendant.

Bushnell, J. This is an appeal by plaintiff, Arthur Stott, from a judgment of no cause of action, entered on defendant Stott Realty Company's motion for a directed verdict. Plaintiff's action is in assumpsit to recover from dividends collected by defendant company on securities that were pledged to it by plaintiff as collateral for loans. The determination of the matters in dispute depends upon the interpretation of the several loan agreements.

Upon the death of plaintiff's father, David Stott, practically all of the stock of the defendant corporation passed to his testamentary trustees. The beneficiaries named in the will were plaintiff, Arthur Stott, and all his brothers and sisters. This testamentary trust was dissolved in 1925. Prior to this time, Arthur Stott, being in need of funds, in addition to those he ordinarily would receive as dividends from defendant company, secured a loan from defendant and pledged as security therefor all of his stock in the defendant corporation and other stocks and bonds.

Later, being in default as to this loan, and desiring an additional loan of $50,000, he entered into a written agreement with defendant company on October 2, 1924, in which he acknowledged, (1) an existing indebtedness of $23,922.80, under an agreement dated August 17, 1923, covering the purchase of 1,700 shares of the capital stock of defendant company; (2) a default of $400; (3) an additional indebtedness of $43,690.79, by reason of an assignment by Bertha A. Stott to defendant company of her claim against Arthur Stott; and (4) a further indebtedness of $11,302.50, because of other moneys advanced to him to enable him to pay certain debts.

This agreement further provided that defendant company would advance an additional $50,000 to the plaintiff and extend the time of payment of his past indebtedness, and that the loans should be repaid in the following manner:

"The Stott Realty shall collect and receive all cash dividends, proceeds, income and revenues of every kind whatsoever from each and all of the securities herein pledged, under the terms of this agreement, and apply the same first to the payment of interest which shall grow due under any and all indebtedness owing to the said Stott Realty Company from the said Arthur F. Stott, and the balance, if any remaining, upon the principal of said debts or either of them, as in its judgment it may see fit. All stock dividends realized from said pledged securities shall be held by the Stott Realty Company by way of pledge as additional collateral security for the repayment of all sums due from said Arthur F. Stott hereunder."

The agreement contained the usual provisions for sale of the pledged securities upon default.

This additional $50,000 was advanced by defendant. Shortly thereafter, Stott was married and he became in need of further funds. After some negotiations between the parties, another written agreement was made, dated October 14, 1926. This agreement referred to the 1924 agreement and subsequent advances of $11,612.15. Stott confirmed and acknowledged his then indebtedness as of June 30, 1926, in the total amount of $122,174.94. The agreement recited Stott's desire to divert a portion of the income and revenue from the pledged securities in an amount "available to him only and cancellable at his option." After a formal ratification and confirmation of the existing indebtedness and the agreements of October 2, 1924, and October 14,

1926, the parties agreed among other things as fol-, lows: That there would be released to Stott on his written request, out of dividends, the sum of $400 monthly, and this monthly payment was to be raised to $500 or $600 a month, if the amount of dividends derived from the pledged securities should increase to $21,000 or $27,000 a year. A proviso was included in the agreement, reading as follows:

"4. Notwithstanding the provisions contained above and subject to the provisions contained in paragraph five hereof, it is agreed between the parties hereto that the right to require such advances is personal to said second party (Arthur Stott) and cancellable at his option, and may not be assigned by said second party, nor may the same be seized, attached, or taken by any creditor or receiver appointed to administer the assets of said second party. Immediately upon any right hereunder being assigned, incumbered, attached, seized, or if the same shall in any manner pass out of the full and absolute control of the second party, then and in that event the obligation of the first party (Stott Realty Company) to continue such advances shall cease and terminate."

The language of the paragraph 5 referred to reads:

"5. It is further agreed that upon the death of the second party and notwithstanding the laws of descent and distribution which may be applicable nor any provision in any will made by the second party, the said monthly withdrawals shall be payable to Emily Stott, wife of said Arthur F. Stott, second party, until the termination of said agreement of October 2, 1924, and supplemental agreements."

The agreement also provided that defendant company should continue to collect and receive all divi-

dends on the pledged securities, and "apply the same, first, to the payment of the interest on the sums advanced under the agreement of October 14, 1926, second, to the principal of said advances, third, to the interest due and owing under the agreement of October 2, 1924, and the balance if any, upon the principal of said debts, or any of them, as the judgment of the first party shall direct. All stock dividends realized from pledged securities shall be held by way of additional security for the repayment of all sums due the first party from the second party."

For some time payments were made to Stott as requested, and regular statements of account were rendered by the company. Stott's creditors began to press their claims; a number of suits were started against him, in some of which the company was made a garnishee defendant and in others it was served with writs of attachment. Proceedings were taken by creditors to reach the pledged assets and the monthly payments, and Stott attempted to assign his right to receive these payments. Finally the defendant company elected to terminate Stott's right to continue to receive advances and no further payments were made to him after September 10, 1928.

The present suit to recover the instalments of $400 a month was begun more than 10 years thereafter, namely, on April 4, 1939. In his declaration, Stott denied that his claim was barred by the statutes of limitation and asserted that this money was due on "a mutual and open account current."

Defendant company raised the affirmative defense that Stott's claim was barred by the operation of the statute of limitations, 3 Comp. Laws 1929, § 13976 (Stat. Ann. § 27.605), and, relying upon the proviso (paragraph 4) of the agreement, asked that his action be dismissed. Considerable testimony was pre-

sented and at the conclusion of plaintiff's case defendant's motion for a directed verdict was granted.

We are in accord with the conclusion reached by the trial judge, and quote from his written opinion as follows:

"The Stott Realty Company acted upon the termination provision contained in Exhibit 2, paragraph 4, stopping the payment of October 10, 1928, and has refused to make any further releases. The Weil garnishment was prior to that time, and the Griswold State Bank case was at that time. A few payments were made after the Weil proceedings, but the failure to exercise the provisions of paragraph 4 at that time did not constitute a waiver. Those payments were, rather, voluntary payments after the right to terminate existed.

"Counsel for plaintiff has argued at length in connection with the proceedings of attachment, garnishment and levy which are in the record. In order to avoid the effect of those proceedings, he has endeavored to show that they were irregular, and that if they had been contested, they would have been determined to be void. I am of the opinion, however, that the burden was not on the Stott Realty Company, at its peril, to be sure that the attachment, garnishment or levy cases would ultimately prevail. When a writ of garnishment was served on the corporation, it was bound by that process, and it is immaterial in the case at bar what sort of disclosure was made. In any event, plaintiff's rights under Exhibit 2 had passed out of that full and absolute control contemplated by paragraph 4.

"When Arthur Stott's pledged securities were impounded by process of the court, the corporation found itself embroiled in suits by his creditors, the very contingency against which it had obviously provided by the insertion of paragraph 4 of exhibit 2, reserving the right to cancel the obligation to con-

tinue such advances in that event, and permitting it to apply all of the dividends against Arthur Stott's debt in accordance with exhibit 1. Whether the corporation would be justified in invoking paragraph 4 in the case of a garnishment for a trivial amount is not of decisive moment. The record discloses no such garnishment."

The language of the proviso (paragraph 4) is clear and unambiguous. As said in *Baker* v. *Baird,* 79 Mich. 255, 259:

"It is also of no consequence how either party understood the contract. When parties have reduced their contract to writing, courts will construe it according to the intention therein expressed, when that intention is clear upon its face. Only in cases of ambiguity in the terms of the written contract will courts resort to extraneous evidence to determine the intention of the parties."

In *Gibson* v. *Agricultural Life Ins. Co. of America,* 282 Mich. 282, 290, the court said:

"Where only the contractual rights of the principals are involved and there is no ambiguity in the instrument, that interpretation should be given that gives effect to every provision contained in the contract."

Also, see authorities cited in *Ginsberg* v. *Reliable Linen Service Co.,* 292 Mich. 70, where the court said:

"The language used in a contract, if unambiguous, must be held to express the intention of the parties. * * * Where there is no ambiguity, the language used will be confined to its usual and ordinary meaning. * * * The courts will not make a new contract under the guise of construction. * * * A contract cannot be made by construction because it later appears that a different agreement

should have been consummated in the first instance.''

Neither party questions its validity, although appellant argues that there was a waiver of the conditions of the agreement. We are unable to agree with this contention.

Plaintiff Stott is bound by his agreement, and defendant company acted within its rights under that agreement.

Defendant's motion for a directed verdict was properly granted and the judgment entered thereon is affirmed, with costs to appellee.

BOYLES, C. J., and CHANDLER, NORTH, STARR, WIEST, BUTZEL, and SHARPE, JJ., concurred.