## BIEVER MOTOR CAR CO. v. CHRYSLER CORP.

Civ. A. No. 3194.

United States District Court
D. Connecticut.

May 16, 1952.

Herbert L. Emanuelson, New Haven, Conn., for plaintiff.

Cummings & Lockwood, by William H. Timbers, Stamford, Conn., for defendant.

HINCKS, Chief Judge.

This is an action for breach of contract. The plaintiff, "Biever", was for many years a Chrysler dealer in New Haven. On August 29, 1944 Biever and Chrysler executed two written agreements: an "Agreement Between Chrysler Direct Dealer and Chrysler Corporation, Chrysler Division", and a "Chrysler Direct Dealer-Retail Memorandum of Sales Area." Both agreements were in the form of printed booklets. They superseded other agreements which had previously been in effect between the parties.

The "Memorandum of Sales Area", which was made to be subject to the terms and conditions of the other agreement between the parties, provided that Biever should have the non-exclusive right to purchase Chrysler and Plymouth automobiles for resale in an area consisting of New Haven, West Haven, Hamden, North Haven and East Haven, and that it should have the exclusive right to maintain a place of business for selling such cars in New Haven Township. As to termination, the agreement provided that it should terminate automatically upon the termination of the main agreement between the parties.

The other, main, agreement sets forth at considerable length some of the rights and obligations of the parties in relation to the agency provided for under the "Memorandum of Sales Area." A preface to the

agreement, entitled "Purposes of the Agreement", set forth in general terms what are stated to be the objectives thereof and provided that "the terms of this agreement relate to the foregoing principles and policies \* \* \*." Under the agreement the dealer was given the privilege of ordering cars from Chrysler, but all orders were made subject to Chrysler's approval and acceptance. The agreement contained no provision as to prices, except that it provided that the dealer should have the advantage of any price reductions made between the time of his order and the time of delivery. No provision was included as to the terms of purchase: instead, the agreement provided merely that Chrysler would keep the dealer informed of prices and would furnish it with terms of purchase. In return for these limited rights Biever obligated itself to furnish various reports to Chrysler, to confine its sales to its own sales area; to maintain an adequate parts inventory; to use only Chrysler-approved advertising matter, etc.

There is no provision in the agreement as to its term. Instead, the agreement embodies two sections concerning termination. These are as follows:

"7

"Reasons for Termination Other Than by Notice

"While it is the desire of Chrysler to establish lasting arrangements with Direct Dealer, it is recognized that certain conditions may arise in which it is impracticable for this agreement to continue in effect. In the interest of friendly relations between Direct Dealer and Chrysler, it is important that the circumstances be set forth so that they may be thoroughly understood by both parties to this agreement. Accordingly it is agreed that this agreement shall terminate immediately by its own force without notice from either party in the event of (1) an attempted assignment of this agreement by Direct Dealer without Chrysler's written consent; (2) an assignment by Direct Dealer for the benefit of creditors; (3) the admitted insolvency of Direct Dealer;

(4) the institution of voluntary or involuntary proceedings by or against Direct Dealer in bankruptcy or under insolvency laws or for corporate reorganization, or for a receivership or for the dissolution of Direct Dealer; (5) the admitted insolvency of any member of Direct Dealer if a partnership; (6) the assumption of any other line of motor vehicles for sale by Direct Dealer, without the written consent of the General Sales Manager or an executive officer of Chrysler; or (7) the discontinuance of Direct Dealer's distribution and resale in his sales area of the products herein referred to. Termination under this paragraph shall not impose any liability upon Chrysler under the provisions of Paragraph 8. It is further agreed by Direct Dealer that he will immediately advise Chrysler in writing of the occurrence of any event specified in this paragraph.

"8

"Termination by Notice

"IT IS ALSO recognized that certain other conditions may arise under which either party may desire to terminate this agreement by giving reasonable notice to the other party. Accordingly it is agreed that this agreement may be terminated, at any time upon not less than ninety (90) or more than ninety-five (95) days' written notice by Chrysler or upon not less than fifteen (15) or more than twenty (20) days' written notice by Direct Dealer, but either of these periods may be reduced by mutual written consent of Direct Dealer and Chrysler. Termination under the provisions of this Paragraph 8 by Chrysler shall not be effective unless the notice bears the written approval of the General Sales Manager or an executive officer of Chrysler. Termination of this agreement shall operate as a cancellation of all unfilled orders for motor vehicles, parts and accessories. Upon termination under the provisions of this Paragraph 8 by Chrysler or by

Direct Dealer, Chrysler agrees to buy, and Direct Dealer agrees to sell within thirty (30) days after the effective date of termination: (a) All new and unused then current model Chrysler and Plymouth motor vehicles which were purchased by Direct Dealer from Chrysler and/or Chrysler Motors of California and are then the property of and in the possession of Direct Dealer, at the net invoice price to Direct Dealer current at the date of termination, including transportation charges paid by Direct Dealer, except vehicles built on Direct Dealer's specific order to other than Chrysler standard specifications, which special vehicles, together with all special equipment pertaining thereto as previously specially specified by Direct Dealer, may or may not be purchased by Chrysler at its option.

"(b) All new, unused and undamaged Chrysler and Plymouth parts for the then current and three (3) preceding models, which ·were purchased by Direct Dealer from Chrysler and/or Chrysler Motors Parts Corporation and/or Chrysler Motors of California and/or by authorized Chrysler Corporation Parts Wholesaler, and are then the property of and in the possession of Direct Dealer, at the net invoice price to Direct Dealer then current at the date of termination, exclusive of transportation charges thereon, less any necessary costs incurred by Chrysler for refinishing or reconditioning parts to restore them to their original salable condition. Prior to such purchases by Chrysler, Direct Dealer shall deliver said parts for inspection F. O. B. Factory or any other point designated by Chrysler.

"(c) All signs of a type recommended by Chrysler belonging to Direct Dealer, showing the names 'Chrysler' or 'Plymouth', at a price to be agreed upon by Chrysler and Direct Dealer."

In February, 1948, pursuant to Section 8 of the agreement, Chrysler informed Biever that, effective ninety days from receipt of notice thereof, it was termi-

nating all agreements in effect between them. This was accompanied by a letter in which the defendant assigned as the reason for its action the death of Mr. Biever, theretofore an executive in the plaintiff corporation. In due course the termination became effective and Chrysler ceased to supply new automobiles to Biever.

Biever claims that this termination was wrongful as to it. It asks $950,000 in damages for losses it claims to have suffered because Chrysler failed to deliver further automobiles to it. In its complaint it alleged that Chrysler attempted to terminate "in the absence of good faith, wrongfully, maliciously, and without cause." This allegation was denied by the defendant who, in addition, alleged as a special defense that the complaint failed to state a claim upon which relief can be granted.

During the course of pre-trial discovery it became clear that the decision of the case might hinge on a question as to the interpretation of the main agreement. The defendant contends that under Section 8 of the contract it had the right to terminate at will, without cause. (Although the defendant denied the allegation in the complaint that the agreements between it and Biever constituted a contract, for present purposes it concedes that a contract did in fact exist.) The plaintiff, on the other hand, takes the position that Section 8 should be interpreted to permit only terminations made in good faith, for cause. To obtain a decision on this point of interpretation in advance of trial, a motion for summary judgment has now been filed by the defendant.

The point of interpretation may properly be determined on this motion since it involves no dispute as to the underlying facts. The giving of the ninety-days notice required under Section 8 is not disputed. Neither is there any dispute as to the defendant's performance of its obligation under that section to repurchase parts, etc., and it in fact appears from the complaint that Beiver has limited itself to a claim for damages growing out of the alleged wrongful termination, without any claim for damage resulting from a breach of the repurchase provisions of Sec. 8.

Section 20 of the main agreement between the parties provided that it should be interpreted and construed according to the law of Michigan. Apparently the courts of Michigan have never been obliged to construe a termination provision of the sort set out in Section 8, supra. Cf. McClintock Co. v. Truxell Sales & Service Co., 297 Mich. 284, 297 N.W. 493. However, identical provisions have been construed by the courts of Kentucky and Texas. Goodwin Bros. v. Cook, 307 Ky. 646, 212 S.W.2d 126 and Wood Motor Co. v. Nebel, Tex.Sup., 238 S.W.2d 181. Both the Goodwin and Wood cases were actions for wrongful termination of a contract, brought by a Chrysler associate dealer against a Chrysler direct dealer. In both cases the contracts in question contained termination provisions which were in all important respects identical with those in the instant case. The Kentucky and Texas courts each held that the provisions which are here contained in Section 8 were clear and unambiguous in meaning and that under them either party was entitled to terminate without cause.

▮ The plaintiff states that the contract in issue here is a form contract prepared by Chrysler for use throughout its dealer organization. This is not denied by the defendant. Under Michigan law, in case of ambiguity, a contract must be construed most strongly against the party preparing it. Seaboard Surety Co. v. Bachinger, 313 Mich. 174, 20 N.W.2d 854. I fail to see that that proposition has any application to the present problem, however, since, like the Texas and Kentucky courts, I find the provision in question both clear and unambiguous.

▮ As I interpret the first two sentences of Section 8, they are intended to state that either party might terminate at will, without cause, whenever the party desired.

The plaintiff contends that the presence of the phrase "certain other conditions" in the first sentence of Sec. 8 compels a different conclusion as to the meaning of the section. The same phrase is used in Section 7 of the agreement and in Section 7 the meaning of the phrase is amplified by the designation of seven specified conditions on the happening of which the agreement will be terminated. And so the plaintiff contends that by inserting the same phrase into Section 8 the parties must have intended to limit the right of termination to a similarly limited set of conditions and they argue that in the absence of any express designation of such conditions in Section 8 it must be assumed that the parties meant something like: "conditions which in the exercise of good faith would justify termination."

However, the giving of such a meaning to the phrase clearly distorts the sense of the sentence since it necessarily ignores the word "desire". Section 7 refers to conditions which would *make it impracticable* for the agreement to continue. Section 8, however, refers more generally to conditions which might *make either party desire* to terminate. It draws no distinction between the various sorts of conditions which might give rise to such a desire and I see no basis from which I could infer such a distinction. It seems to me therefore that Section 8 must be interpreted as intended to establish a procedure which might be utilized by either party in terminating with or without good cause, at desire.

The plaintiff emphasizes also the fact that in the so-called "Purposes of the Agreement", which precede the actual body of the agreement in the form contract used here, there is frequent use of phrases such as "understanding", "cooperation", and "stable and profitable business." It argues that these phrases cannot be given their full meaning if Section 8 is interpreted to allow termination at will. However, I feel that a reading of the contract as a whole, including the "purposes", reinforces rather than weakens the validity of my conclusion that Section 8 was intended to provide for termination at will and that notwithstanding the prolixity of the language used, the expressed intention of the parties, at least as to Section 8, is too clear to have been misunderstood by either.

▮ The plaintiff argues also that a letter sent to its lawyer by the defendant after the date of termination, apparently in reply to a letter protesting the defend-

ant's action, indicates that at that time the defendant also believed that the contract did not permit termination without cause. This letter, however, did not constitute a practical construction of the contract by the defendant: the contract had theretofore terminated. Even if it constituted an admission as to the defendant's then state of mind as to its rights under the contract when it was in force, it was so remote in point of time that it was slight evidence of the defendant's understanding years before when the contract was made. But this apart, the letter fails to support the plaintiff's position. True, the letter states it to be the defendant's policy to exercise its right to terminate dealers' contracts when "a termination is necessary in the interests of sound business" and that the dealer's rights under the contract continue "during such time as his performance, which must be predicated largely on the quality of his management, is satisfactory to both parties, either of whom may withdraw from the agreement for cause." But merely because the defendant had such a policy and recognized the right of both parties to withdraw for cause, by no means demonstrates that the defendant, or the plaintiff either, in entering into the contract understood that its provision, plainly stated, whereby the "agreement may be terminated at any time on not less than ninety days Notice", was to be dependent upon a showing of due cause. Under the circumstances then existing it was natural that the defendant should prefer to attribute its action to sound business reasons rather than to an exercise, seemingly arbitrary, of an unqualified right. But from this belated justification of its action the court may not infer that the defendant, either at the time or earlier when it entered into the contract, understood that its right to terminate was dependent upon due cause. Indeed, on the facts shown here it may be doubted that a Michigan court, if called on to interpret the contract, would look beyond the plain language contained therein. Cf. Sheldon-Seatz Inc. v. Coles, 319 Mich.

401, 29 N.W.2d 832; Stott v. Stott Realty Co., 306 Mich. 492, 11 N.W.2d 215.

During argument on the motion the plaintiff made some attempt to argue that this case is controlled by J. R. Watkins Co. v. Rich, 1931, 254 Mich. 82, 235 N.W. 845. In that case the Michigan court held that a particular provision as to termination, not identical to that in issue here, did not permit termination except upon good cause. However, in 1940 in the case of Bushwick-Decatur Motors, Inc. v. Ford Motor Co., 116 F.2d 675, 676, in a case apparently identical on its facts to this, the Court of Appeals for this circuit held the Watkins case inapplicable and allowed a termination without cause. In so doing the court laid particular emphasis on the fact that the Bushwick-Ford contract expressly provided for termination "at the will of either party", as well as the fact that there was no claim that Bushwick had been misled in entering into the contract. I find that similar facts obtain here. In the absence of any Michigan or Connecticut cases to the contrary, therefore, I feel compelled to adopt the interpretation of Michigan law set out in the Bushwick case. The one Michigan case decided since the Watkins case, which seems in point, appears to support the Bushwick opinion. McClintock Co. v. Truxell Sales & Service Co., 1941, 297 Mich. 284, 297 N.W. 493. Furthermore, in 1950, the United States District Court in Michigan, in interpreting a contract like that in the Bushwick case, expressly approved and followed the Second Circuit's conclusions as to the law of Michigan. Martin v. Ford Motor Co., D.C., 93 F.Supp. 920; Cf. Busam Motor Sales Co. v. Ford Motor Co., D.C.S.D.Ohio, W.D.1949, 85 F.Supp. 790.

I conclude, therefore, that the defendant was entitled to terminate its contract with the plaintiff without cause. This conclusion leads inevitably to the further conclusion that the defendant is entitled to a judgment with costs.

It is so ordered and the Clerk will enter judgment accordingly.