TURNER v BITUMINOUS CASUALTY COMPANY

Docket No. 55831. Argued December 13, 1974. (Calendar No. 14).—
Decided August 26, 1976. Rehearing denied 399 Mich 951.

Charles Turner was injured on July 26, 1969, while operating a
power press manufactured by T. W. & C. B. Sheridan Company
(old Sheridan), which was incorporated in 1903, and is not a
party to this suit. Turner and his wife, Gertha, brought this
action in 1972 against defendants Harris-Intertype Corporation,
its subsidiary which was also named T. W. & C. B. Sheridan
Company (new Sheridan), and others, alleging that negligent
design of the power press manufactured by old Sheridan caused
Turner's injury and that Harris and new Sheridan assumed the
liabilities of old Sheridan. Harris had agreed in 1964 to pur-
chase the assets of old Sheridan for cash and to assume certain
liabilities as listed on May 1, 1964. Harris formed a new
corporation as a wholly owned subsidiary, defendant new Sheri-
dan, and designated it to receive the assets of old Sheridan
which was renamed "Nadirehs, Inc.". Cash proceeds of the sale
were distributed to the shareholders and Nadirehs, Inc., was
dissolved on May 5, 1964. Turner received workmen's compen-
sation from defendant Bituminous Casualty Company, his em-
ployer's insurance carrier, which is not involved in this appeal.
The Wayne Circuit Court, John D. O'Hair, J., granted summary
judgment for defendants Harris and new Sheridan. The Court
of Appeals, Bronson, P. J., and Danhof and Quinn, JJ., denied
leave to appeal (Docket No. 19499). Plaintiffs appeal. *Held:*

1. The issue is one of products liability in tort law, rather than of
corporate law. The underlying policy is that the hazards of
predicting and insuring for risk from defective products are
better borne by the manufacturer than the consumer. Neither
the plaintiff nor the successor corporation has a different
interest in the products liability suit whatever the type of
corporate acquisition—merger, de facto merger, or sale of assets
for cash—so long as the selling corporation is dissolved.

2. Products liability may attach to a corporation which acquires

REFERENCES FOR POINTS IN HEADNOTES
[1, 3–10] 19 Am Jur 2d, Corporations §§ 1528–1538, 1546 *et seq.*
[2] 63 Am Jur 2d, Products Liability § 26.

the assets of a manufacturer of a product for cash where the totality of the acquisition transaction demonstrates a basic continuity of the enterprise between the selling corporation and the buyer using these guidelines: (a) there is a continuity of management, personnel, physical location, assets, and general business operations of the selling corporation; (b) the selling corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (c) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation.

3. The plaintiff established a prima facie case of continuation of corporate products liability by showing retention of key personnel, assets, general business operations, and the Sheridan name; the seller ceased business operations, liquidated and dissolved soon after distribution of consideration from the buyer; the buyer assumed those liabilities of the seller ordinarily necessary for the continuation of the enterprise; and the buyer held itself out as a continuation of the selling corporation.

Summary judgment reversed and remanded to the trial court for further proceedings.

Justice Coleman, Justice Fitzgerald concurring, dissented. She would affirm the judgment for the defendants on the ground that:

1. The general rule is that a corporation which purchases all of the assets of another corporation is not, without more, responsible for the debts and liabilities of the selling corporation.

2. The exceptions to the general rule are that the purchasing corporation is liable where 1) the sale was fraudulent as to creditors; 2) the transaction amounts to a consolidation or merger of the buying and selling corporation; 3) the purchasing corporation is merely a continuation of the selling corporation; or 4) the purchasing corporation assumes liability.

3. The sale here was not fraudulent, in that the consideration was adequate and no lack of good faith appears. The de facto merger exception does not apply, because there was a sale for cash, not for stock in the purchasing corporation. The purchasing corporation is not a mere continuation of the selling corporation by the usual tests, *i.e.,* it is not a new hat for the same owners, and extension of the continuation exception to hold the purchasing corporation liable for the obligations of the selling corporation is ill advised. If the Legislature wishes to impose assumption of all liabilities by operation of law on the pur-

chaser in a sale of all assets, it may do so. Harris and new
Sheridan did not assume liability for the plaintiffs' products
liability claim. The terms of the purchase agreement for old
Sheridan and the list of assumption of liabilities show that the
contracting parties did not intend that defendants would as-
sume future and contingent liabilities such as this claim which
arose after the sale but wanted to calculate, as nearly as
possible, the net worth of old Sheridan as of the time of
purchase.

Affirmed.

### OPINION OF THE COURT

1. PRODUCTS LIABILITY—CORPORATIONS—SALE OF ASSETS—ASSUMPTION
   OF LIABILITY.

   Products liability may attach to a corporation which acquires the
   manufacturer of the product for cash where the totality of the
   acquisition transaction demonstrates a basic continuity of the
   enterprise between the manufacturer and the acquiring corpo-
   ration, under these guidelines: (a) there is a continuity of
   management, personnel, physical location, assets, and general
   business operations of the selling corporation; (b) the selling
   corporation ceases its ordinary business operations, liquidates,
   and dissolves as soon as legally and practically possible; and (c)
   the purchasing corporation assumes those liabilities and obliga-
   tions of the seller ordinarily necessary for the uninterrupted
   continuation of normal business operations of the selling corpo-
   ration.

2. PRODUCTS LIABILITY—ALLOCATION OF RISK—PUBLIC POLICY.

   The underlying public policy of products liability law is that the
   hazards of predicting and insuring for risk from defective
   products are better borne by the manufacturer than the con-
   sumer.

3. PRODUCTS LIABILITY—CORPORATIONS—SALE OF ASSETS—ASSUMPTION
   OF LIABILITY—ESTOPPEL.

   A corporation which purchases the assets of enterprise which
   manufactures a product and holds itself out as in effect a
   continuation of the original enterprise for the purpose of sales
   of the product, or omits to deny a continuation of the enter-
   prise, is estopped from denying that it is the original enterprise
   for the purpose of determining products liability.

4. PRODUCTS LIABILITY—CORPORATIONS—SALE OF ASSETS—ASSUMPTION
   OF LIABILITY.

   A plaintiff in a products liability suit established a prima facie

case of continuation of corporate products liability from the manufacturer of a product to a corporation which purchased the manufacturer's assets for cash where the facts showed (1) a basic continuity of the seller's enterprise, including retention of key personnel, assets, general business operations, and the corporate name; (2) the seller ceased business operations, liquidated and dissolved soon after the proceeds of the sale were distributed to the stockholders; (3) the buyer agreed to assume the liabilities of the seller necessary to continue normal business operations; and (4) the buyer held itself out as the effective continuation of the selling corporation.

DISSENTING OPINION

COLEMAN and FITZGERALD, JJ.

5. CORPORATIONS—SALE OF ASSETS—ASSUMPTION OF LIABILITIES.

*One corporation which purchases all the assets of another is generally not, without more, responsible for debts and liabilities of the selling corporation.*

6. CORPORATIONS—SALE OF ASSETS—ASSUMPTION OF LIABILITIES.

*Obligations of a corporation which is sold to or consolidates with another are assumed by the consolidated or purchasing corporation (1) when two or more corporations consolidate and form a new corporation, making no provision for the payment of the obligations of the old; (2) when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation; (3) when the new corporation is a mere continuation of the old: (4) when the sale is fraudulent, and the property of the old corporation, liable for its debts, can be followed into the hands of the purchaser.*

7. CORPORATIONS—SALE OF ASSETS—FRAUDULENT CONVEYANCES.

*Indicia of that fraud in the sale of corporate assets which permits creditors of the selling corporation to pursue the assets in the hands of the transferee may be inadequate consideration paid to the transferor or lack of good faith in the transaction; choosing the sale of assets method of transfer because liability is not assumed by the transferee is not by itself a lack of good faith.*

8. CORPORATIONS—SALE OF ASSETS—DE FACTO MERGER.

*Continuity of shareholders' interest from a corporation selling assets to the acquiring corporation is a key element for identification of a de facto merger of the corporations which allows imposition of liabilities of the selling corporation on the acquir-*

*ing corporation; for a de facto merger to exist, consideration for
the assets is stock of the acquiring corporation, the acquired
corporation ceases to exist, the acquiring corporation takes over
the entire operation of the acquired corporation, and sharehold-
ers of the acquired corporation become shareholders of the
acquiring corporation.*

9. Corporations—Sale of Assets—Mere Continuation.

*The "mere continuation" exception to the general rule of nonlia-
bility of an acquiring corporation for the obligations of a
corporation which sells its assets, by which the acquiring
corporation is liable if it is a mere continuation of the selling
corporation, encompasses the situation where one corporation
sells its assets to another corporation with the same people
owning both corporations; rather than extension of the excep-
tion to a case where there has been a definite change of
ownership by a tenuous analogy to the tort law of strict
liability, a comprehensive legislative approach to the problem
is recommended.*

10. Products Liability—Corporations—Sale of Assets—Assump-
tion of Liabilities.

*An agreement by one corporation purchasing the assets of an-
other to assume certain liabilities of the seller "existing on the
closing date" limits the assumption to liabilities in existence on
that date and does not extend to a products liability claim
which arises from an injury four years after the sale of assets.*

*Ripple & Chambers, P. C. (Craig, Farber & Stein,*
of counsel), for plaintiffs.

*Alexander, Buchanan & Seavitt* (by *John N.
Highland)* for defendants Harris-Intertype Corpo-
ration and T. W. & C. B. Sheridan Company.

Amicus Curiae: *Morton E. Schneider* and
*Thomas M. McGuire* for the Michigan Trial Law-
yers Association.

Williams, J.

*Introduction*

This is a products liability case.

After the transfer of the name, personnel, properties and products of a manufacturing corporation in a cash sale, and the corporation's subsequent dissolution as a part of the acquisition plan, an injury occurred on a press manufactured and sold by that corporation prior to the corporate transfer. The purchasing corporation was sued in tort and defended on the basis that it was a corporate stranger to the manufacturer and hence not liable.

Where the corporate transfer involves either a merger or a de facto merger, the law is clear that liability attaches to the consolidated or acquiring corporation. The issue here narrows down to whether an acquisition for cash should be treated the same as an acquisition for stock; and, if so, under what circumstances.

In our opinion there may be a cause of action where the totality of the transaction demonstrates a basic continuity of the enterprise.

## I—FACTS

Charles Turner was injured by a power press while working at the Seaman Manufacturing Company on July 26, 1969, and, as a result, both his hands were amputated. Identifying marks on the press indicated it had been manufactured by the T. W. & C. B. Sheridan Company. Plaintiff received worker's compensation benefits from his employer, and filed a third-party action against the manufacturer of the press on July 11, 1972.

However, the following events had occurred prior to his accident.

The manufacturer of the press, the T. W. & C. B. Sheridan Company (hereinafter, Old Sheridan), a New York corporation, was established in 1903.

The press was apparently purchased by Turner's employers second-hand in 1968.

On April 13, 1964, Old Sheridan and the Harris-Intertype Corporation executed an agreement by which Harris was to purchase the entire business, good will, name, and assets of Old Sheridan. This *"Agreement to Sell and Buy, and Consideration"* also provided that Harris would assume certain liabilities of Old Sheridan by separate agreement.[1]

On April 27, 1964, Old Sheridan filed a certificate changing its name to Nadirehs, Sheridan spelled backward. Also, on April 27, incorporators acting on behalf of Harris filed a certificate of incorporation in New York state under the name T. W. & C. B. Sheridan Company.

---

[1] Relevant parts of this agreement include:

"I. *Agreement To Sell and Buy, and Consideration*

"1. Sheridan agrees to sell to Harris and Harris agrees to purchase, or to cause a wholly-owned subsidiary (the 'subsidiary') to purchase, from Sheridan on the closing date hereinafter referred to: the entire business and all of the good will, name, assets and property, real, personal and mixed, tangible and intangible, owned by Sheridan, except as specifically excluded in this section, but subject, however, to those liabilities of Sheridan which are to be assumed by Harris or the subsidiary as provided in section 3 of this part I hereof."

* * *

"3. (a) On the closing date, Harris or the subsidiary shall assume all the liabilities of Sheridan existing on the closing date (including, without limiting the generality of the foregoing, all obligations under the collective bargaining agreements), except (i) liabilities of Sheridan to its stockholders as such (ii) any liability of Sheridan for legal, accounting or other expenses in connection with the transaction covered by the agreement, (iii) any liabilities of Sheridan incurred * * * relating to the purchase of certain of its outstanding common stock, and (iv) any liabilities of Sheridan for income or other taxes * * * ."

Other significant aspects of the agreement included provisions which required Sheridan to cause its three wholly owned subsidiaries to be merged into itself, and Sheridan was to deliver its business as a going concern. Only its corporate minutes and stock record books, corporate seals and its franchise to be a corporation were to be excluded from the books, records, documents and files to be delivered to Harris. Harris agreed to execute and deliver an employment agreement to Old Sheridan's president, and Sheridan agreed to use its best efforts to cause its employees to remain with Harris or the subsidiary.

On April 30, 1964, Harris designated New Sheridan as its subsidiary to acquire and accept the assets of Old Sheridan.

On May 1, 1964, representatives of Harris and Old Sheridan executed an Assumption of Liabilities contract.[2] Four days later, on May 5, following payment by Harris of $6.38 million, and distribution of these assets to its shareholders, Old Sheridan was dissolved. New Sheridan remained a wholly-owned subsidiary of Harris until July 24, 1968, when it formally merged with Harris and became the Sheridan Division of Harris-Intertype Corporation.

The circuit judge, finding that Harris and New Sheridan had no relationship to the equipment sold and manufactured by Old Sheridan and that Old Sheridan had gone through the process of dissolution and liquidation, granted the motion of defendants Harris and New Sheridan for summary judgment. The court held that Harris and New Sheridan "are not responsible for a product to which they are corporate strangers in the manufacture, sale and distribution thereof, and for which they neither in fact nor law assumed legal liability".

The Court of Appeals denied leave to appeal. We granted leave June 27, 1974. 392 Mich 763 (1974).

## II—PLAINTIFFS' CONTENTIONS

Plaintiffs' essential case is that:

---

[2] Under this agreement, New Sheridan stated it "hereby assumes and agrees to pay, perform and discharge all debts, obligations, contracts and liabilities of Old Sheridan of any kind, character or description, whether accrued, absolute, contingent or otherwise, as reflected on the balance sheets, books of account and other records of Old Sheridan on the date hereof * * * ".

" * * * the defendants Harris-Intertype Corporation and T. W. & C. B. Sheridan Company (1964) held themselves out to the public as the manufacturer of the press in question. It would be totally unfair to permit an organization to assume the name of another, to use that name, to manufacture identical products and then when the crunch comes, to deny that it is one and the same as its predecessor."

Plaintiffs principally rely on *Shannon v Samuel Langston Co,* 379 F Supp 797 (WD Mich, 1974). The transaction in *Shannon* was similar to that in the case at bar, even to the presence of Harris-Intertype as the acquiring corporation. Although *Shannon* may be distinguished from the instant case by the use of stock as consideration, the policy factors relied on in *Shannon* to find defendant liable for the post-transaction injury are also found in the present case. Judge Fox recognized the importance of the stock transfer, but significantly stated:

"The public policy behind the evolving common law of products liability is that the enterprise, the going concern, ought to bear the liability for the damages done by its defective products. While the incidence and amounts of such damages are not perfectly predictable, they are nonetheless regarded as an economically and socially necessary cost of doing business.

"In this case, the enterprise, Samuel M. Langston Company, continued substantially unchanged after it had been acquired by the Harris-Intertype Corporation in 1966. Harris-Intertype got all the advantages of an established going concern, including expertise, reputation, established customers, and so forth. Public policy requires that Harris-Intertype, having received the benefits of a going concern, should also assume the costs which all other going concerns must ordinarily bear.

* * *

"The solvent natural person cannot avoid his liability

for injuries caused by him simply by changing the form of his property or by changing his name or by changing the numbers on his bank accounts. Similarly, solvent corporations, going concerns, should not be permitted to discharge their liabilities to injured persons simply by shuffling paper and manipulating corporate entities." 379 F Supp 802, 803.

Plaintiffs and amici also attempt to interpret the agreement between the parties to include the products liability suit as a "contingent or otherwise" liability "on the balance sheets * * * on the date hereof". See fn 2, *supra*. However, since this opinion disposes of the matter on the basis of tort liability, the argument on contractual interpretation will not be considered.

### III—DEFENDANTS' CONTENTIONS

Defendants' substantive argument is that:

"A bona fide purchaser of corporate assets for $6.38 million in cash, who voluntarily agrees to assume every known liability of seller as of the closing date of May 1, 1964, is not liable for a products liability claim against seller which did not arise for some four years later, where seller and purchaser were at all times complete corporate strangers having no common control whatsoever."

Defendants distinguish *Shannon* by interpreting liability of the successor corporation as based on a finding that the transaction between the two corporations was a de facto merger. Defendant urges that a de facto merger can occur only when a transfer of stock is involved and that such a finding would be impossible in the instant case, where only cash is involved.

Defendant then argues as follows:

"The facts are uncontroverted that Harris did form Sheridan 1964, and that the latter assumed the name of the selling corporation (Sheridan 1903). Obviously, Harris is a well-known corporation on the New York Stock Exchange and has been a well-known corporation for years. It would make no business sense for Harris to change its name. Obviously the only prudent business decision was for Harris to form a new corporation which could inherit the name of the selling corporation, and thus, hopefully, continue on with the goodwill which the selling corporation had established with the public over a period of approximately sixty years. There is nothing unusual or fraudulent in Harris setting up a corporation to inherit the name of a corporation which Harris paid a huge sum of cash to, where part of the assets purchased were the goodwill and name of the selling corporation. Michigan has long recognized that goodwill is a legitimate corporate asset to be purchased. *Brown v Weeks,* 195 Mich 27, 38–39 [161 NW 945] (1917). If goodwill is to be indeed acquired, it certainly will not occur if the purchaser operates its business under a new name, foreign to the public. Obviously, there must be continuity in the eyes of the public."

In passing we observe that defendants have thus cogently marshalled reasons for, and facts showing, "continuity" between Old Sheridan and New Sheridan.

### IV—Products Liability Law Must Govern

This is a products liability case first and foremost.

Products liability law is a fast-developing area. All the rules have not yet been formulated and products liability law, as it matures, has to shake off various impediments associated with traditional concepts, which, while relevant to other problems, are inappropriate for this new area.

Thus, for example, it was not until *Spence v*

*Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120, 135; 90 NW2d 873 (1958), that we rejected the indirect approach and forthrightly abolished the requirement of privity in products liability cases. We did so because we were persuaded that the concept of privity of contract had nothing to do with liability or nonliability predicated on the law of torts.

In a similar vein, the New York Court of Appeals rejected the contractual statute of limitations in products liability cases, reasoning that "[r]ather than arising out of the 'will or intention of the parties', [products liability] * * * is predicated largely on considerations of sound social policy". *Victorson v Bock Laundry Machine Co,* 37 NY2d 395; 335 NE2d 275, 277; 373 NYS2d 39 (1975).

For the same reasons, defendants' reliance on the so-called "general rule of non-liability" whereby, with certain limited exceptions,[3] the purchasing corporation is not liable for obligations of the transferor corporation, is inapposite. That rule

---

[3] The general rule is that, as in the instant case,

" '[I]f one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts.

*       *       *

" 'There are certain instances, however, in which the purchaser or transferee may become liable for the obligations of the transferor corporation. The transferee may be held liable for the debts of the transferor corporation: (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.' (19 Am Jur 2d, Corporations, § 1546, pp 922–924; *Malone v Red Top Cab Co,* 16 Cal App 2d 268, 273 [60 P2d 543 (1936)].)" *Schwartz v McGraw-Edison Co,* 14 Cal App 3d 767; 92 Cal Rptr 776; 66 ALR3d 808, 820–821 (1971).

developed not in response to products liability
problems, but largely in the areas of creditors'
protection, Note, *Assumption of Products Liability
in Corporate Acquisitions,* 55 Boston U L Rev 86,
95 (1975), and of tax assessments, *Cyr v B Offen &
Co, Inc,* 501 F2d 1145, 1150 (CA 1, 1974), or, in the
case of the de facto merger, in the context of
shareholder rights. *See Applestein v United Board
& Carton Corp,* 60 NJ Super 333; 159 A2d 146, 151
(1960); *aff'd* 33 NJ 72; 161 A2d 474 (1960). Most of
these policies may fairly be said to have arisen
from case law, and are not specifically found in the
statutes.

While the Legislature has spoken directly to
problems of creditors and shareholders, nonethe-
less the courts have had to fill in the interstices
where legislation was lacking. Consequently, it is
not surprising in the much newer field of products
liability to find that legislatures have not yet come
to grips with some of the problems of the victim of
defective products and that therefore the courts
must do so.

Further, case law that developed to protect the
rights of creditors and minority shareholders, in
all probability is not applicable to meeting the
substantially different problems associated with
products liability torts. Thus, not only do we oper-
ate in a relatively uncharted field when we explore
the ramifications of products liability, but the facts
of the instant case reveal a situation not previ-
ously dealt with in our jurisdiction.

## V—Underlying Logic

In order to develop a reasonable rule for prod-
ucts liability cases which arise subsequent to cor-
poration transfers, it is necessary to go back to
basics. In so doing we must review the problem
from the standpoints of both the plaintiff injured

person and the defendant acquiring corporation.

To the injured person the problem of recovery is substantially the same, no matter what corporate process led to transfer of the first corporation and/or its assets. Whether the corporate transaction was (1) a traditional merger accompanied by exchange of stock of the two corporations, or (2) a de facto merger brought about by the purchase of one corporation's assets by part of the stock of the second, or (3) a purchase of corporate assets for cash, the injured person has the same problem, so long as the first corporation in each case legally and/or practically becomes defunct. He has no place to turn for relief except to the second corporation. Therefore, as to the injured person, distinctions between types of corporate transfers are wholly unmeaningful.

From the corporate point of view likewise, the implications of a possible products liability suit after transfer do not depend on the form of corporate transfer. Regardless of the mode selected, both transferor and transferee wish to know as exactly as possible what they are buying and selling in order to establish an appropriate price.

Further, the transferee would be equally handicapped by products liability suits developing after the transfer has occurred, regardless of what that transfer is called. Once the deal is made and the transferor corporation is extinguished, the transferee has nowhere to go for relief.

Despite this reality, the traditional corporate law approach in non-products-liability cases has been to largely condition successor responsibility on whether the transaction is labeled a merger, a de facto merger, or a purchase of assets for cash.

It is the law in Michigan that if two corporations merge, the obligations of each become the

obligations of the resulting corporation. *D F Broderick, Inc v Continental Credit Corp,* 309 Mich 546, 550; 16 NW2d 68 (1944). In such a situation, therefore, the injured person could sue the new corporation.

This is also true if, regardless what the parties call it, the transaction is deemed to be a de facto merger. *E.g., Shannon v Samuel Langston Co,* 379 F Supp 797, 801 (WD Mich, 1974); *Fairfield v Samuel Langston Co,* No K-18-71 CA (WD Mich, May 12, 1974); *Knapp v North American Rockwell Corp,* 506 F2d 361 (CA 3, 1974). As summarized in *Shannon,* the requirements of a de facto merger are:

"(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

"(2) There is a continuity of shareholders which results from the *purchasing corporation paying for the acquired assets with shares of its own stock,* this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

"(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

"(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." Citing *McKee v Harris-Seybold Co, Div of Harris-Intertype Corp,* 109 NJ Super 555; 264 A2d 98, 103–105 (1970), *aff'd* 118 NJ Super 480; 288 A2d 585 (1972). (Emphasis added.)

The defendant herein contends that where there is a cash transfer, as opposed to the stock transaction described in the second principle, *supra,* the injured party is not entitled to sue. *McKee,* 264 A2d 104.

## VI—SHOULD THERE BE A DIFFERENT PRODUCTS LIABILITY CONSEQUENCE FOR DE FACTO MERGERS AND SALES OF ASSETS FOR CASH?

Is there a reasonable legal or logical difference, all other things being equal, to justify products liability recovery where an acquisition is made through the transfer of some of the acquirer's stock but not where the acquisition is for cash?[4]

The stated difference between a stock payment and a cash payment is that in the first situation there is a commonality of ownership. Judge Fox in *Shannon,*[5] explained:

---

[4] A recent decision of the California Court of Appeal, *Ray v Alad Corp,* 55 Cal App 3d 855; 127 Cal Rptr 817, 821 (1976),* in continuing the trend to finding successor corporation liability, answered the question simply thus:

"The manufacturing entity's responsibility to the victims of defective products it has placed in circulation cannot be hostage to the niceties which distinguish a sale of assets from a merger."

In that case, the successor corporation, Alad II, "took over the plant and offices used by Alad I, used the same personnel, the same dye records and extrusion plans; it sold ladders under the same trade name, solicited Alad I's customers and used the same manufacturers' representatives." Further, the former owner stayed with the new company for about six months, and one of the officers of Alad II "agreed that it was his intention to 'continue doing business at the same old stand using the same old name.'" 127 Cal Rptr 819.

---

* Superseded by the opinion of the California Supreme Court, 19 Cal 3d 22; 136 Cal Rptr 574; 560 P2d 3 (1977), which arrived at the same result, citing this opinion.—REPORTER.

---

[5] Although Judge Fox distinguished *Shannon* from *McKee,* both of which involved questions of New Jersey law, by emphasizing that *Shannon* involved a transfer of stock, while the consideration in *McKee* included cash, it is noteworthy that the transferor in *McKee* continued to function as a corporation for one year following the sale. Further, the Superior Court of New Jersey attempted to resolve the problem by applying the general rule to determine whether a de facto merger, consolidation, or continuation could be found as a matter of corporate law. The court found that adequate consideration had been paid for the transaction and that the transferor, although stripped of its manufacturing function, continued to exist for a sufficient period to render application of the general rule appropriate. *McKee's* equation of an empty shell with a continuing, viable corporate entity, along with its de-emphasis on continuity of manufacturing operations, is not consistent with modern products liability concepts.

"As the *[McKee]* court said, the 'two corporations
* * * were strangers before the sale and continued to
remain strangers after the sale,' 264 A2d at 104. How-
ever, in the present case, although the two corporations
were strangers before the transaction, they were not
strangers afterwards because the purchase of assets was
exclusively with the stock of the purchasing corpora-
tion." 379 F Supp 801–802.

The reasoning behind this must be that share-
holders of the first company, become, as a result of
the stock transfer, shareholders of the second cor-
poration. Technically, this argument is strong. The
presence of stock as consideration should be one
factor to use to determine whether there exists a
sufficient nexus between the successor and prede-
cessor corporations to establish successor liability.
However, the absence of an exchange of stock
should not be conclusive. The proportionate num-
ber of shares paid out by the acquiring corporation
may be very small in a corporate assets purchase,
and usually is, so that the strength of commonal-
ity of ownership is quite minimal. The continuity
of shareholders is apt to be a paper one, more
symbolic than real. The actual owners of shares at
the time of manufacture of the alleged defective
product and the actual owners at the time of sale
of the corporation assets may be entirely different
individuals.

Finally, it seems both unfair and unbelievable
that a corporate combination or acquisition deci-
sion would be principally or exclusively made on

The analysis of the decision in *Kloberdanz v Joy Manufacturing Co,*
288 F Supp 817 (Colo, 1968), may be similarly criticized. In addition,
the facts are even further from those in the case at bar than even the
situation in *McKee.* In *Kloberdanz,* the transferor leased its buildings
and invested the proceeds of the sale following completion of the
transaction. This is hardly a case involving timely dissolution of a
defunct corporation. Further, the sale of assets did not result in
creation of a new corporation to accommodate these assets.

the basis of cutting off the contingent right to sue of a products liability victim. From that, two conclusions suggest themselves. First, it would seem illogical that a merger or de facto merger be encumbered by liability for a products liability suit while a cash acquisition of corporate assets is free from such liability. Second, on the other hand, if there are no real business reasons for choosing a cash acquisition of corporate assets and the only real reason is to avoid products liability suits, then it would seem that the machinery of corporate law is unreasonably geared up to accomplish a purpose not really intended for it or in the public interest.

Summarizing then, logically and teleologically, there is no basis for treating a purchase of corporate assets different from a de facto merger. Both the injured party and the transferee corporation have common goals in each situation. It would make better sense if the law had a common result and allowed products liability recovery in each case.

This is precisely the result when the problem is correctly treated as a products liability case and is decided on products liability principles rather than simply by reexamining and adjusting corporate law principles.

As the court in *Alad* so forthrightly stated:

"This case has nothing to do with * * * the technical differences between a sale of assets * * * , mergers, consolidation * * * and the many other ways by which ownership of the Alad manufacturing enterprise could have been transferred from Hambly to Stern and his associates.

"The issue is, rather, one of tort law: does a manufacturer's responsibility for its defective products survive a change in ownership, where the manufacturing business, as such, maintains its identity and continues to

operate as before 'at the same old stand' ". 127 Cal Rptr 819–820.

## VII—PRODUCTS LIABILITY CONTINUITY PRINCIPLE

With products liability in mind, the most significant opinion for our guidance is *Cyr v B Offen & Co, Inc,* 501 F2d 1145 ,(CA 1, 1974). The assets of one corporation were purchased for cash by the defendant company. Two persons were subsequently injured by a machine built by the first corporation. Defendant contended it was a stranger to the sale of the machine. The opinion, in allowing recovery, is noteworthy in three regards. First, it recognized the problem as one of tort. Second, it clearly relied on the rule of "continuity". Third, it recognized the underlying policy "that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than the consumer". 501 F2d 1145, 1154.[6]

The Court of Appeals said:

"Thus, where *tort liability* is concerned, we should look to factors relevant to the specific claim and not be bound by the factors that control where other debts and liabilities are concerned. But first we face two threshold arguments. Offen first contends that it could not be held liable to plaintiffs for the simple reason that it was not in existence when the equipment was sold and installed and thus had no relationship with buyers or users of the equipment on which a duty of care could be predicated. *This argument begs the question at issue: should B. Offen & Co., Inc. be treated as the continuation of B. Offen Company?* The corporate veil has never been

---

[6] This is a significant rationale for imposing strict liability for a defective product in the first place, *i.e.,* the manufacturer has superior ability to bear the cost of injuries, and is the only one who can improve the product's quality. *United Mine Workers v Coronado Coal Co,* 259 US 344; 42 S Ct 570; 66 L Ed 975 (1922).

treated as an iron curtain barring examination of the facts peculiar to the individual case.

\* \* \*

" \* \* \* The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.

" \* \* \* [I]t is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from an *[sic]* exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment." 501 F2d 1145, 1153, 1154. (Footnotes omitted, emphasis added.)

In a similar vein, Judge Fox in *Shannon* emphasized both the tort nature of the action and the concomitant public policy rationale. *Shannon* stressed, too, the concept of continuity between the transferor and transferee corporations, as well as the fairness inherent in requiring the company benefiting from continuing the business of the former company to bear some of the burdens as well. 379 F Supp 802, 803.

That there was "continuity" in the instant case and that Old Sheridan and New Sheridan were not really "corporate strangers", whatever they might be called technically, was clearly indicated in the quotation from defendant's brief above. Defendant

eloquently argued, *supra,* business reality requires
that the "new" Sheridan be as much as possible
like the "old" Sheridan in order to make the
purchase of the "old" Sheridan pay off for the
"new" Sheridan. By maintaining similarity of
product, personnel and policy, the good will of
"old" Sheridan can help the "new" Sheridan re-
tain the clients of the "old" company and acquire
new clients attracted by the established reputation
and continuity of the "old" business.

Under such circumstances to say Old Sheridan
is a stranger to New Sheridan, and vice versa, is to
honor form over substance. The natural purpose of
New Sheridan was to incorporate Old Sheridan
into its system with as much the same structure
and operation as possible. Continuity is the pur-
pose, continuity is the watchword, continuity is
the fact.

Because this is a products liability case, how-
ever, there is a second aspect of continuity which
must also be considered. Where the successor cor-
poration represents itself either affirmatively or,
by omitting to do otherwise, as in effect a continu-
ation of the original manufacturing enterprise, a
strong indication of continuity is established. Jus-
tice would be offended if a corporation which holds
itself out as a particular company for the purpose
of sales, would not be estopped from denying that
it is that company for the purpose of determining
products liability. This was recognized in another
context in the Restatement Torts, 2d, § 400, which
decrees that "[o]ne who puts out as his own prod-
uct a chattel manufactured by another is subject
to the same liability as though he were its manu-
facturer". See *Ray v Alad Corp, supra; Ortiz v
South Bend Lathe,* 46 Cal App 3d 842; 120 Cal

Rptr 556, 560, 561 (1975) (Fleming, J., dissenting); *cf. Shane v Hobam, Inc,* 332 F Supp 526, 530 (ED Pa, 1971); *Bathory v Procter & Gamble Distributing Co,* 306 F2d 22 (CA6, 1962).

## VIII—ECONOMIC IMPACT OF SUCCESSOR LIABILITY ON CORPORATE TRANSFERS

It is clear that the assumption of liability for defective products by a successor corporation is not unknown, even under the "general rule", *supra,* fn 3. Defendant acknowledges that if the transaction had been in the nature of a merger, there would have been no question that Harris-Intertype would be liable. The same is true of a de facto merger. Yet corporate mergers continue to occur, even in the face of such contingent obligations. It has not been demonstrated that the possibility of liability would have a different effect on other forms of corporate acquisition.

Defendant contends that it is necessary to insulate transactions involving the purchase of assets for cash from the possibility of successor liability for defective products in order to avoid crippling the market for such purchases. This kind of objection was made and ultimately rejected, for example, when courts debated when the statute of limitations should start running in products liability cases.[7] It is even less persuasive in the present

---

[7] The New York Court of Appeals unleashed a storm of criticism when it first accepted these arguments and adopted the contractual statute of limitations in products liability cases, announcing it was "willing to sacrifice the small percentage of meritorious claims that might arise after the statutory period has run in order to prevent the many unfounded suits that would be brought and sustained against manufacturers ad infinitum". *Mendel v Pittsburgh Plate Glass Co,* 25 NY2d 340; 253 NE2d 207, 210 (1969). *See, e.g.,* Henn & Alexander, *Effect of Corporate Dissolution on Products Liability Claims,* 56 Cornell L Rev 865, 913, fn 230 (1971). The New York Court later rejected that position in *Victorson.*

context of an existing, thriving market in corporate mergers, where the possibility of such liability is already established.[8]

Even the argument of surprise is likewise without merit.

"While the first such successor to be faced with such a liability may claim surprise, the claim lacks legal force. For this kind of surprise is endemic in a system where legal principles are applied case by case and is no more an injustice than was the retroactive application of the strict liability doctrine in *Stephan v Sears, Roebuck & Co,* 110 NH 248, 266 A2d 855 (1970)." 501 F2d 1145, 1154.

It is clear that once corporations considering such transactions become aware of the possibility of successor products liability, they can make suitable preparations. Whether this takes the form of products liability insurance, indemnification agreements or of escrow accounts, or even a deduction from the purchase price is a matter to be considered between the parties. Negotiations may be complex, but, with familiarity, they should become a normal part of business transactions.

Defendant argues that rather than go through this, corporations will opt for piecemeal divestiture. For some, this may be the solution. However, such sales usually realize less than the sale of the entire company. Therefore it may be more profitable for a selling corporation to sacrifice part of the ideal selling price rather than for it to take the more substantial loss resulting from piece-by-piece sales. In any event, these "cassandrian argu-

---

[8] *See, e.g.,* The Wall Street Journal, April 28, 1976, 1, 33, for an analysis of the popularity of transactions for cash, in which concern about the stock market and changing accounting principles appear to be significant considerations, and nothing is said about the effect of products liability suits.

ments", Juenger & Schulman, *Assets Sales and
Products Liability,* 22 Wayne L Rev 39, 57 (1975),
are far too speculative to cause us to reject the
realities which direct our conclusion.

## IX—CONCLUSION

In our analysis of the matter we must conclude
at this point that in a products liability case where
the corporation fabricating the injury-producing
item changes corporate structure before injury and
suit, as a matter of policy neither the victim nor
the successor corporation has a different interest
vis-à-vis the suit whatever the type of corporate
metamorphosis—merger, de facto merger, or sale
of assets for cash—so long as the transferor corpo-
ration becomes defunct.

While a difference in degree can be established
between the continuity arising from a stock trans-
fer as opposed to a cash payment for assets, it is
just that, a difference in degree. Logically it is not
dispositive. As the brief of defendant, set out
above, so eloquently indicates, continuity through
transfer from the first corporation to the second of
its policy, operations, personnel and properties is
the major purpose of the acquisition and corporate
change. It is this continuity that makes business
sense. It is the consideration for the whole deal.

These reasons lead us to believe that the first,
third and fourth criteria quoted in *Shannon* from
*McKee* as tests of continuity of interest, and there-
fore responsibility, are all relevant, with the first
as perhaps of greatest significance.

Furthermore, we must recognize that it does not
make sense or promote justice to require a merger
and a de facto merger to respond to products
liability suits, and then to leave a transfer of

assets for cash free from suit, when the needs and objectives of both the injured party and the corporation are the same in all three instances. Finally, it is difficult to see that the possibility of products liability litigation is a manageable problem in mergers and de facto mergers, and an unmanageable one when corporate assets are sold for cash.

As a consequence, we adopt the rule that in the sale of corporate assets for cash, the first, third and fourth criteria set forth in the *Shannon* quotation from *McKee* shall be guidelines to establish whether there is continuity between the transferee and the transferor corporations. If there is such continuity, then the transferee must accept the liability with the benefits.

Applying to the relevant principles the facts developed in the instant case prior to summary judgment, we find:

1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and even the Sheridan name.

2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.

The above-listed evidence makes out a prima facie case of continuation of corporate responsibility for products liability. As this trial ended in summary judgment, the facts must be viewed in

the light most favorable to plaintiff against whom the summary judgment was found.

We reverse the summary judgment and remand the matter to the trial court for further proceedings not inconsistent with this opinion.

Costs to plaintiffs.

KAVANAGH, C. J., and LEVIN, J., concurred with WILLIAMS, J.

LINDEMER and RYAN, JJ., took no part in the decision of this case.

COLEMAN, J. The principal issue is whether the purchasing corporation in a sale of assets may be held for product liability of the purchased corporation under the facts here presented. We would affirm the circuit court's finding of no liability.

## FACTS

The cause of this product liability litigation is an injury on July 26, 1969 while operating an allegedly negligently designed power press. The accident occurred while plaintiff was engaged in his employment at Seaman Manufacturing Company. This appeal does not involve defendant Bituminous Casualty Company, the workmen's compensation insurance carrier for Seaman. Plaintiff has received $45,000 of workmen's compensation from Seaman.

The power press was manufactured by T. W. & C. B. Sheridan Company (Sheridan [1903]), which was incorporated under New York law in 1903.

On April 13, 1964, Sheridan (1903) and Harris-Intertype Corporation (Harris) agreed on a sale of assets. Harris agreed to purchase or to cause a wholly owned subsidiary to purchase the business

assets, name, goodwill, property, real, personal and mixed, tangible and intangible, owned by Sheridan (1903). The purchase agreement is a detailed document, containing specific exclusions and inclusions.

Crucial to the issues raised by plaintiff, the purchase agreement recites that Harris "agrees that it or the Subsidiary shall (a) *on the Closing Date assume and agree to pay all liabilities of Sheridan,* except as hereinafter provided * * * ". The following section of this agreement provides that: *"On the Closing Date, Harris or the Subsidiary shall assume all the liabilities of Sheridan on the Closing Date * * * ".* Closing date was established as May 1, 1964, and the agreement provided that Harris or the subsidiary would provide Sheridan (1903) with an instrument evidencing the assumption of Sheridan's (1903) liabilities. That instrument provided that the subsidiary designated by Harris to acquire the Sheridan (1903) assets "hereby *assumes* and agrees to pay, perform and discharge *all debts, obligations, contracts and liabilities of [Sheridan (1903)] of any kind, character or description, whether accrued, absolute, contingent or otherwise, as reflected on the balance sheets, books of account and other records of [Sheridan (1903)] on [May 1, 1964]* * * * ".

On April 27, 1964, Sheridan (1903) changed its name to "Nadirehs," Sheridan spelled in reverse. Also on April 27, 1964, Harris formed a new corporation as a wholly owned subsidiary, T. W. & C. B. Sheridan Company [Sheridan (1964)]. On April 30, 1964, Harris designated Sheridan (1964) as the subsidiary to receive assets of Sheridan (1903). On May 1, 1964, Sheridan (1964) then executed the instrument evidencing the assumption of Sheridan's (1903) referenced liabilities.

On May 5, 1964, Nadirehs, *i.e.,* Sheridan (1903),

was dissolved in New York after having distributed the 6.38 million dollar purchase price to its shareholders. The purchase agreement with Harris did not require dissolution of Sheridan (1903).

On July 24, 1968, Sheridan (1964) merged into Harris and it is now the Sheridan Division of Harris.

On July 11, 1972, plaintiff brought suit against, among others, Harris and Sheridan (1964), based on the July 26, 1969 injury. The instant appeal is from a summary judgment found for defendants by Circuit Judge John D. O'Hair under GCR 1963, 117.2, based on an affidavit and deposition of an employee of Harris and the purchase agreement. Defendants were held "not responsible for a product to which they are corporate strangers in the manufacture, sale and distribution thereof, and for which they neither in fact nor law assumed legal liability." Plaintiff sought, and was denied, leave to appeal before the Court of Appeals. This Court granted leave to appeal. 392 Mich 763 (1974).

Plaintiff argues that Sheridan (1964) is the successor corporation to Sheridan (1903), and Sheridan (1964) is, therefore, liable to plaintiff. Denial of liability would, in effect, allow parties to such a transaction to make their own statute of limitations, negating the time for accrual of a claim of MCLA 600.5827; MSA 27A.5827. Further, the purpose of the creation of Sheridan (1964) and dissolution of Sheridan (1903) was to insulate Harris from product liability for Sheridan (1903) after May 1, 1964. Finally, plaintiff argues that Harris and/or Sheridan (1964) assumed, under the purchase agreement, all liabilities and obligations including the products liability of Sheridan (1903).

Defendants argue that the facts disclose that the purchaser (Harris) and seller (Sheridan [1903]) are

strangers in a normal sale of assets. In a bona fide sale of assets, only liabilities agreed upon are assumed. The assumption language of the purchase agreement is unambiguous and does not include liabilities accruing in the future, *i.e.,* liability is only assumed as reflected as an item in the balance sheet on May 1, 1964 (the closing date). Plaintiff did not plead the de facto merger basis of liability so he should not be allowed to raise it on appeal. Further, this is not a case of de facto merger.

The basic issue in this case is whether Harris and/or Sheridan (1964) can be held liable to plaintiff where Sheridan (1903) manufactured the alleged negligently designed machine and injury occurred several years after Sheridan (1903) sold its assets to Harris and dissolved.

## I. The General Rule

Generally, when one corporation sells all its assets to another, the purchaser is not, without more, responsible for debts and liabilities of the selling corporation. This is a long-standing, well-recognized rule.[1]

---

[1] *See, e.g., West Texas Refining & Development Co v Commissioner of Internal Revenue,* 68 F2d 77 (CA 10, 1933), *Pierce v Riverside Mortgage Securities Co,* 25 Cal App 2d 248; 77 P2d 226 (1938), *Mank v Southern Kansas State Lines Co,* 143 Kan 642; 56 P2d 71 (1936), *Sinclair Refining Co v Rayville Motor Co,* 160 So 179 (La App, 1935), *Swing v Empire Lumber Co,* 105 Minn 356; 117 NW 467 (1908), *Pankey v Hot Springs National Bank,* 46 NM 10; 119 P2d 636 (1941), *Coline Oil Corp v State,* 184 Okla 545; 88 P2d 897 (1939) and *Bowyer v Boss Tweed-Clipper Gold Mines, Inc,* 195 Wash 25; 79 P2d 713 (1938). More recent applications of the general rule may be seen in *Forest Laboratories, Inc v The Pillsbury Co,* 452 F2d 621 (CA 7, 1971), *Copease Manufacturing Co v Cormac Photocopy Corp,* 242 F Supp 993 (SD NY, 1965), *International Association of Machinists v Shawnee Industries, Inc,* 224 F Supp 347 (WD Okla, 1963), *Comstock v Great Lakes Distributing Co,* 209 Kan 306; 496 P2d 1308 (1972), *Lamb v Leroy Corp,* 85 Nev 276; 454 P2d 24 (1969). For a complete collection of all cases invoking the general rule, *see* 15 Fletcher, Private Corporations, § 7122 n 1.

In *Chase v Michigan Telephone Co,* 121 Mich 631; 80 NW 717 (1899), plaintiff was injured while working for the Telephone & Telegraph Construction Co. Several months after the injury, that company sold all its assets to Michigan Telephone Co. Plaintiff sued the latter company, claiming it had assumed all obligations and tort liability of the Telephone & Telegraph Construction Co. The Court held that connection of the two companies through stock ownership, retention of employees and officers, and conduct of the same business was not enough to show assumption of liability of the former company. The Court noted that a statute authorized "one corporation to sell to another, and * * * the selling corporation shall not be released from any or all of its liabilities previously contracted". *Chase, supra,* at 634. The Court rejected cases finding liability:

"None of them support the proposition that a purchasing corporation is responsible for the liquidated or unliquidated claims of the selling corporation, in the absence of statute or agreement. If A. [sells] his manufacturing plant or business of any kind to B., B. does not thereby assume the debts of A., unless he agrees to. B.'s liability is not affected by the fact that A. or B., or both, are corporations. The same rule of law applies to

*See generally,* 19 Am Jur 2d, Corporations, § 1546; Annot, 49 ALR3d 881.

Several key cases recognizing the general rule are *Knapp v North American Rockwell Corp,* 506 F2d 361 (CA3, 1974), *Cyr v B Offen & Co,* 501 F2d 1145 (CA 1, 1974), *Alexander & Baldwin, Inc v Peat, Marwick, Mitchell & Co,* 385 F Supp 240 (SD NY, 1974), *Lopata v Bemis Co,* 383 F Supp 342 (ED Pa, 1974), *Shannon v Samuel Langston Co,* 379 F Supp 797 (WD Mich, 1974), *Shane v Hobam, Inc,* 332 F Supp 526 (ED Pa, 1971), *Kloberdanz v Joy Manufacturing Co,* 288 F Supp 817 (D Colo, 1968) *Chadwick v Air Reduction Co,* 239 F Supp 247 (ND Ohio, 1965), *J F Anderson Lumber Co v Myers,* 296 Minn 33; 206 NW2d 365 (1973), *McKee v Harris-Seybold Co,* 109 NJ Super 555; 264 A2d 98 (1970).

both. The mere fact of sale does not establish liability."
p 636.[2]

Several exceptions to the general rule are as
well recognized as the rule itself. *Chase* noted the
exceptions:

"The law is well settled in regard to liability of the
consolidated or purchasing corporation for the debts
and liabilities of the consolidating or selling corpora-
tion. Such obligations are assumed (1) when two or
more corporations consolidate and form a new corpora-
tion, making no provision for the payment of the obliga-
tions of the old; (2) when by agreement, express or
implied, a purchasing corporation promises to pay the
debts of the selling corporation; (3) when the new
corporation is a mere continuance of the old; (4) when
the sale is fraudulent, and the property of the old
corporation, liable for its debts, can be followed into the
hands of the purchaser." (p 634)

Nearly every case employing the general rule also
discusses the exceptions. For example, the Court in
*McKee v Harris-Seybold, supra* fn 1, noted at p
561:

"It is the general rule that where one company sells
or otherwise transfers all its assets to another company
the latter is not liable for the debts and liabilities of the
transferor, including those arising out of the latter's
tortious conduct, except where: (1) the purchaser ex-
pressly or impliedly agrees to assume such debts; (2) the
transaction amounts to a consolidation or merger of the
seller and purchaser; (3) the purchasing corporation is
merely a continuation of the selling corporation, or (4)
the transaction is entered into fraudulently in order to
escape liability for such debts."

---

[2] Recent Michigan application of this rule may be found in *Denolf v
Frank L Jursik Co,* 54 Mich App 584; 221 NW2d 458, *leave to appeal
granted* 393 Mich 770 (1974). *See also, Clark v Detroit Curling Club,*
298 Mich 339; 299 NW 99 (1941), *Tawas & B C R Co v Iosco Circuit
Judge,* 44 Mich 479; 7 NW 65 (1880).

See generally, 19 Am Jur 2d Corporations, § 1546; Annot, 49 ALR3d 881; 15 Fletcher, Private Corporations, § 1722.

## II. THE FRAUD EXCEPTION

The general rule of nonliability holds except where the transaction is fraudulent as to creditors of the transferor. The creditors may then follow the property to the transferee. Indicia of fraud may be inadequate consideration paid to the transferor, and/or lack of good faith. There is no evidence of inadequate consideration in the instant case, and plaintiff has made only the vaguest charges of fraud through lack of good faith in structuring the particular acquisition method used.

The courts have demanded that adequate consideration be paid to the transferor so it will be able to pay its creditors. At the time of this transaction, the consideration given was adequate to meet creditors' demands. The real problem here is that plaintiff's demand for damages did not occur until several years after the corporate acquisition and subsequent dissolution.

Plaintiff does make vague charges of a lack of good faith in choosing the sale of assets method since traditionally liability is not assumed. However, no court has chosen to call this fraudulent. See cases cited in 15 Fletcher, Private Corporations, § 7122, n 9.

## III. THE DE FACTO MERGER EXCEPTION

The de facto merger doctrine is most often encountered in relation to shareholder voting and appraisal rights.

The requirements for a merger are statutory.

Michigan generally requires approval of the board of directors and shareholders of each corporation in a merger. MCLA §§ 450.1701, 450.1703; MSA §§ 21.200(701), 21.200(703). Shareholders of the acquiring corporation have the right to vote on whether to merge as do shareholders of the acquired corporation. Further, those shareholders who choose to dissent from the plan of merger are provided by statute with appraisal rights—they may force the corporation to buy back their shares at the appraised value. MCLA § 450.1761; MSA 21.200(761). This applies for shareholders of both the acquired and acquiring corporations.

A sale of assets is also provided by statute. MCLA § 450.1753; MSA 21.200(753). For the purchasing corporation, the decision to buy the assets of another corporation is a board function, and approval of its shareholders is not necessary, but statute does generally require both board and shareholder approval for an asset sale on the part of the acquired corporation. Thus, a merger normally requires shareholder approval of both acquired and acquiring corporations while a sale of assets requires only shareholder approval of the acquired corporation (the seller). Also, a shareholder of the acquired corporation may dissent and exercise appraisal rights. MCLA 450.1761; MSA 21.200(761). However, shareholders of the acquiring corporation are given no such rights by statute. Thus, while shareholders of both acquired and acquiring corporations in a merger are given appraisal rights, statute only gives appraisal rights to shareholders of the acquired corporation in a sale of assets. In fact, of the many factors to be considered in choosing an acquisition method, the absence of voting and appraisal for shareholders of the acquiring corporation may, at times, be of

controlling importance. Appraisal rights may involve a substantial cash drain, stopping the acquisition.

It is this absence of appraisal rights for the acquiring corporation shareholders that has caused some courts to invoke the de facto merger doctrine.

In *Applestein v United Board & Carton Corp,* 60 NJ Super 333; 159 A2d 146 (1960), the Court addressed the problem of an acquisition in the form of an asset sale, where a shareholder of the acquiring corporation complained that he was denied appraisal rights. The shareholder argued that the asset sale was, in effect, a merger and appraisal rights should be given. The Court noted at 344–345:

"But when an authorized device, such as that provided for in a *sale * * * of assets * * * , is used to bring about a virtual * * * merger,* minority stockholders may object on the ground that a direct method has been authorized for such a purpose. If * * * merger is permitted through a pretended sale of assets * * * , minority stockholders may be frozen out of their legal rights of appraisal. If the court is obliged to consider only the device employed, or the mere form of the transaction, a corporate merger in fact can be achieved without any compliance with the statutory requirements for a valid merger, and without any regard for the statutory rights of dissenting shareholders. It would be strange if the powers conferred by our Legislature upon corporations * * * for a purchase of the property and shares of another corporation and * * * for the merger of a parent corporation with a wholly-owned corporation can effect a corporate merger *de facto,* with all the characteristics and consequences of a merger, without any of the legislative safeguards and rights afforded to a dissenting shareholder in a *de jure* merger * * * . If that were so, we obtain the anomalous result of one part of the corporation law rendering nugatory

another part of the same law in accomplishing the same result."

In finding the asset sale to be a de facto merger, the Court stressed at p 348:

"Thus, every factor present in a corporate merger is found in this corporate plan, except, perhaps, a formal designation of the transaction as a 'merger'. There is proposed: (1) a transfer of all the shares and all the assets of [seller] to [buyer]; (2) an assumption by [buyer] of [seller's] liabilities; (3) a 'pooling of interests' of the two corporations; (4) the absorption of [seller] by [buyer], and the dissolution of [seller]; (5) a joinder of officers and directors from both corporations on an enlarged board of directors; (6) the present executive and operating personnel of [seller] will be retained in the employ of [buyer]; and (7) the shareholders of the absorbed corporation * * * will surrender [their] shares * * * for * * * newly issued shares in [buyer], the amalgamated enterprise."

The New Jersey Court later refused to extend the de facto merger doctrine where two corporations worked closely together. *Good v Lackawanna Leather Co,* 96 NJ Super 439; 233 A2d 201 (1967).

In *Farris v Glen Alden Corp,* 393 Pa 427; 143 A2d 25 (1958), the Pennsylvania Supreme Court likewise recognized the de facto merger doctrine, using an approach similar to that in *Applestein.* The Court commented on the rationale of providing appraisal rights for parties to a merger:

"The rationale * * * is that when a corporation combines with another so as to lose its essential nature and alter the original fundamental relationships of the shareholders among themselves and to the corporation, a shareholder who does not wish to continue his membership therein may treat his membership in the origi-

nal corporation as terminated and have the value of his shares paid to him." *Farris, supra,* at 433.

See *Troupiansky v Henry Disston & Sons, Inc,* 151 F Supp 609 (ED Pa, 1957), *Marks v Autocar Co,* 153 F Supp 768 (ED Pa, 1954), *Rath v Rath Packing Co,* 257 Iowa 1277; 136 NW2d 410 (1965). But see *Pomierski v W R Grace & Co,* 282 F Supp 385 (ND Ill, 1967), *Cummings v United Artists Theatre Circuit, Inc,* 237 Md 1; 204 A2d 795 (1964). See also *Pratt v Ballman-Cummings Furniture Co,* 254 Ark 570; 495 SW2d 509 (1973).

In *Hariton v Arco Electronics, Inc,* 41 D Ch 74; 188 A2d 123 (1963), the Delaware Supreme Court rejected the de facto merger doctrine, stating at p 76:

"We now hold that the reorganization here accomplished through [a sale of assets] and a mandatory plan of dissolution and distribution is legal. This is so because the sale-of-assets statute and the merger statute are independent of each other. They are, so to speak, of equal dignity, and the framers of a reorganization plan may resort to either type of corporate mechanics to achieve the desired end."

The Delaware Supreme Court again rejected the doctrine:

"While the argument made may have a surface plausibility, it nevertheless is contrary to the uniform interpretation given the Delaware Corporation Law over the years to the effect that action taken in accordance with different sections of that law are acts of independent legal significance even though the end result may be the same under different sections. The mere fact that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result

must be tested by the requirements of the second section." *Orzeck v Englehart,* 41 D Ch 361, 365–366; 195 A2d 375 (1963).

Michigan courts have not spoken on the de facto merger doctrine in relation to shareholder rights,[3] and we are not presented with that issue in the instant case.

However, the de facto merger doctrine has been applied in a quite different context—creditors', rather than shareholders' rights. When merger occurs, the acquiring corporation assumes all liabilities of the acquired corporation by operation of law. MCLA 450.1722; MSA 21.200(722). On the other hand, the general rule for an asset sale does not impose such liability on the acquiring corporation, but one of the four exceptions to the general rule exists when a de facto merger is found.

Many of the older cases mention the de facto merger exception but any discussion is generally terse and

---

[3] The Reporter for the Michigan Law Review Commission (requested in 1968 by the Private Corporations Committee of the House and the Senate Corporations Committee to draft the new Business Corporations Act), Stanley Siegel, commented (following the sale of assets section):

"The sale-of-assets technique has been widely used to achieve the effect of a merger. Some commentators and courts have seen potential for abuse in the sale-of-assets type merger, in that it may be used to deny shareholders of the surviving corporation any right to vote or to demand appraisal. The common law in some states has developed a doctrine of 'de facto merger', which requires that some or all of the formalities of a merger be complied with if a sale-of-assets has the effect of a merger. See the leading case of *Farris v Glen Alden Corp,* 393 Pa 427, 143 A2d 25 (1958) (applying the appraisal remedy where the putative 'seller' was in fact the 'buyer'). Compare *Rath v Rath Packing Co,* 136 NW2d 410 (Iowa, 1965) (requiring vote where sale had the effect of merger.) Delaware appears to have rejected the 'de facto merger' doctrine; *see e.g., Heilbrunn v Sun Chem Corp,* 38 Del Ch 321, 150 A2d 755 (1959).

"Though the status of the 'de facto merger' doctrine is clear in Delaware, it is unclear in most other jurisdictions. *It was the intention of the Law Revision Commission to adopt the Delaware view* rejecting the 'de facto merger' doctrine." (Emphasis added.) Siegel, *The Michigan Business Corporation Act 159 (Midwest Business Planners 1972).* This is further supported by the view that the new Michigan Business Corporation Act is intended to be permissive and less restrictive. *See,* Siegel, *supra,* at xiv, 1, 4.

The problem of what meaning to give such comments was discussed in *Applestein, supra.*

confusing. See cases cited in 15 Fletcher, *supra,* at § 7122 n 8. Several more recent cases discuss the imposition of liability upon the acquiring corporation under the de facto merger doctrine.[4]

In *Kloberdanz v Joy Manufacturing Co,* 288 F Supp 817 (D Colo, 1968), plaintiff was injured at work by an alleged defectively manufactured piece of equipment. The equipment was manufactured by Web-Wilson in or before 1953. In February, 1960, defendant purchased the assets and name of Web-Wilson for cash, assuming certain listed liabilities. Plaintiff's injury occurred in 1964. Web-Wilson was dissolved in December, 1960. The Court stated the general rule and its four exceptions, finding none of the four exceptions applicable. There was no fraud, and defendant did not assume plaintiff's tort liability. Moreover, no de facto merger was found because: (1) Web-Wilson continued its corporate existence for several months after the sale, investing the proceeds, and (2) no officers continued as stockholders or employees. Thus, buyer (defendant) and seller (Web-Wilson) were strangers before and after the sale.

In *McKee v Harris-Seybold Co,* 109 NJ Super 555; 264 A2d 98 (1970), plaintiff was injured in 1968 while at work by a machine manufactured in 1916 by the Seybold Machine Company. In 1926, the Seybold Machine Co. sold its assets, name and goodwill to the Harris Automatic Press Co.—the contract was assigned to Harris-Seybold-Potter Co. which later changed its name to Harris-Seybold Co. Seybold changed its name to the Washington Machine Co. and was dissolved in 1928. The Court stated the general rule, ultimately finding none of the exceptions applicable.

---

[4] *Forest Laboratories, Inc v Pillsbury Co,* 452 F2d 621 (CA7, 1971) (de facto merger not found), *Bazan v Kux Machine Co,* 358 F Supp 1250 (ED Wis, 1973) (de facto merger not found), *United States v Van Raalte Co,* 328 F Supp 827 (SD NY, 1971) (de facto merger found), *Hoche Productions, S A v Jayark Films Corp,* 256 F Supp 291 (SD NY, 1966) (de facto merger found), *International Association of Machinists, Local 954 v Shawnee Industries, Inc,* 224 F Supp 347 (WD Okla, 1963) (de facto merger not found), *Ortiz v South Bend Lathe,* 46 Cal App 3d 842; 120 Cal Rptr 556 (1975) (de facto merger not found), *Thaxton v Roberson,* 224 So 2d 183 (La App, 1969) (de facto merger not found), *American Hospital & Life Insurance Co v Kunkel,* 71 NM 164; 376 P2d 956 (1962) (de facto merger found).

In discussing the de facto merger exception, the Court referred to the de facto merger doctrine involving shareholder rights, as discussed in *Applestein* and *Farris.* The Court stressed reasons for use of the doctrine in a sale of assets situation: (1) " 'A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing *corporation will remain.' " McKee, supra,* at 564; (2) the shareholders of the acquired corporation continue as shareholders in the acquiring corporation; (3) the proxy statement termed the transaction a "pooling of interests"; (4) the selling corporation is intended to be dissolved; (5) all liabilities are assumed by the acquiring or purchasing corporation and (6) retention of management and personnel.

The Court noted that, while Seybold did sell all its assets, the consideration was almost all cash, not securities. Thus, there was no "continuity of stockholder interest in the purchasing corporation", *McKee, supra,* at 566, *i.e.,* shareholders of the selling corporation remained as shareholders of that entity and did not become shareholders of the purchaser, as in a true merger. Also, since the selling corporation was not dissolved for over a year, it remained as a separate entity and was not absorbed into the purchaser (only the seller's assets and operations were absorbed). The Court found no broad assumption of liabilities, as in de facto merger cases, and no intent for a merger. The corporations were strangers and separate entities before and after the sale of assets. Therefore, the de facto merger doctrine was inapplicable, and plaintiff could not hold defendant liable as a successor corporation.

In *Lopata v Bemis Co,* 383 F Supp 342 (ED Pa, 1974), plaintiff was injured while at work in 1971 by a machine manufactured by Rock Wool Engineering & Equipment Co. Rock Wool had sold its assets to defendant in 1966. Rock Wool then changed its name and dissolved in 1967. The Court stated the general rule and declined to find any of the four exceptions applicable. The de facto merger theory was rejected on the same basis as in *McKee*—there was no change in the relationship of the two corporations and their shareholders after the sale.

The de facto merger exception to the general rule was also rejected by the Kansas Supreme Court recently, although in a factually different situation—a partial asset sale through foreclosure. *Comstock v Great Lakes Distributing Co,* 209 Kan 306; 496 P2d 1308 (1972).

However, in *Shannon v Samuel Langston Co,* 379 F Supp 797 (WD Mich, 1974), Judge Noel Fox held an acquiring corporation in a sale of assets liable under the de facto merger doctrine.

In *Shannon,* plaintiff while at work in 1967 was injured by a machine manufactured by Samuel M. Langston Co. in 1952. In 1966, Harris Intertype Corp. had purchased all assets and the name of Samuel M. Langston Co. Consideration was entirely Harris stock. The old Samuel M. Langston Co. then changed its name to the SML Corp. This company was later dissolved, distributing the Harris stock to its shareholders. The opinion does not indicate the date of dissolution. Harris formed the Langston company as a wholly owned subsidiary to receive the assets; and, in 1968 this subsidiary corporation was statutorily merged into Harris, operating as the Langston Division of Harris. Employees were retained and operations remained as before the asset sale.

The court stated the general rule and discussed *McKee,* the New Jersey case. The court summarized the characteristics of a de facto merger:

"1. There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

"2. There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

"3. The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

"4. The purchasing corporation assumes those liabili-

ties and obligations of the seller ordinarily necessary
for the uninterrupted continuation of normal business
operations of the seller corporation." *Shannon, supra,*
at 801.

The court went on to find a de facto merger on
the facts: "There was certainly a continuity of
management, personnel, physical location, assets,
general business operations, and shareholders".
The purchased company did not continue because
the Harris stock given as consideration was dis-
tributed in dissolution. The old business continued
in Harris, the old corporation ceased existence and
shareholders of the purchased corporation became
shareholders of the new corporation. Further, all
liabilities were assumed as necessary for continua-
tion of normal business. Thus, most of the factors
present in *Applestein* were also present in *Shan-
non,* and the asset sale achieved the same result as
a merger. This situation was different from *McKee*
because there shareholders of the seller did not
continue as shareholders in the buyer and the
seller did not dissolve for a year. However, the key
factor is the shareholder interest. The fact that
the seller continued in existence and did not dis-
solve for a year does not provide sufficient distinc-
tion from a case of immediate dissolution—neither
case provides protection for future claims and
projected dissolution in barely one year equates a
very insubstantial existence. Four points for a de
facto merger are listed in *Shannon. McKee* and
*Shannon* are essentially identical on each, except
continuity of shareholders. In each, the enterprise
itself continued, dissolution occurred soon after the
sale, and normal business liabilities were assumed.
In *McKee,* the two corporations were strangers
before and after the asset sale. In *Shannon,* the
two corporations were strangers before, but not

after the sale. The difference is continuation of shareholder interest.

In *Knapp v North American Rockwell Corp,* 506 F2d 361 (CA3, 1974), the Court, applying Pennsylvania law, allowed plaintiff to hold an acquiring corporation in an asset purchase liable on the de facto merger doctrine. The facts and reasoning were essentially parallel to *Shannon,* except that 18 months elapsed between sale and dissolution of the selling corporation. However, the Court noted that the purchase agreement required dissolution as soon as possible (similar to *Shannon).*

The de facto merger doctrine is not applicable on the instant facts. The instant case is of the *McKee* variety, not *Shannon.* Consideration in the instant case was all cash and therefore a necessary element of a de facto merger is missing. For a de facto merger to exist, consideration must be stock of the acquiring corporation. Such stock transfers supply that crucial characteristic of a merger to an asset sale—continuity of shareholder interest from the selling corporation to the acquiring corporation. The two corporations are no longer strangers after the asset sale—they are, in effect, merged. Even *Shannon* noted that *McKee* involved an entirely different situation from that of an asset sale with stock consideration:

"The cases in which the courts have found that there was no *de facto* merger are all distinguishable on their facts. Most importantly, *McKee, supra,* involved a situation in which the purchasing corporation paid for the acquired assets principally in cash, so that the stockholders of the seller corporation never became a part of the purchasing corporation. As the court said, the 'two corporations * * * were strangers before the sale and continued to remain strangers after the sale,' 264 A2d at 104. However, in the present case, although the two corporations were strangers before the transaction, they

were not strangers afterwards because the purchase of assets was exclusively with the stock of the purchasing corporation."*Shannon, supra,* at 801–802.

Although other factors discussed by *Shannon* are present in the instant case and in *McKee,* continuity of shareholder interest is a key element for identification of a de facto merger.

The de facto merger doctrine operates on the premise that achieving the results of a statutory merger through the vehicle of an asset sale should impose the burdens and obligations of a merger, whether appraisal or voting rights for acquiring corporation shareholders, or assumption of all liabilities of the acquired corporation by operation of law. The general results of a merger are that the acquired corporation ceases to exist, the acquiring corporation takes over the entire operation of the acquired corporation and shareholders of the acquired corporation become shareholders of the acquiring corporation. In *McKee* and in the instant case, the first two elements were present, but not the third. Is this enough for a de facto merger?

The de facto merger doctrine was judicially created to remedy a situation where acquisitive corporations were entering by the "back door" into mergers, thereby avoiding pains of complying with the merger statute. If the merger result is not achieved, the de facto merger doctrine is not the prescription.

## IV. THE MERE CONTINUATION EXCEPTION

Plaintiff argues that defendant is liable because it is a mere continuation of Sheridan (1903), thus falling within an exception to the general rule. This is the most confused of the four exceptions.

At least the de facto merger doctrine has some established rules, with two opposing views on validity of the doctrine itself. The older cases generally contain little discussion on the mere continuation exception. What little can be found is not clear, but the exception seems to encompass the situation where one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. This is actually a reorganization. See 15 Fletcher, *supra,* § 7122, n 10. However, several recent cases discuss the mere continuation exception, with one extending it considerably.

In *Kloberdanz,* the Court discussed this exception. After having rejected the de facto merger exception, the Court also rejected the mere continuation exception:

"[The selling corporation] continued to exist after the sale, and there was no common identity of stock, directors, officers or stockholders between Joy and Web-Wilson. This exception covers a re-organization of a corporation. 15 Fletcher, Cyclopedia of the Law of Private Corporations § 7122, at 194–96 & nn 41–43 (1961 Rev Vol). There is no evidence of this here." *Kloberdanz, supra,* at 821.

In *McKee,* the Court also rejected the mere continuation exception. The Court noted that while all assets of the selling corporation were purchased and used to make the same product by the buying corporation, there was no continuity of management although some officers of the seller were employed by the buyer. Further, stockholders of the seller did not become shareholders of the buyer because cash was used as consideration, not stock of the buyer. The Court concluded that con-

tinuation of the seller's operations was not sufficient to find a mere continuation as a basis of liability. "For liability to attach, the purchasing corporation must represent merely a 'new hat' for the seller." *McKee, supra,* at 570.

In *Comstock v Great Lakes Distributing Co,* 209 Kan 306; 496 P2d 1308 (1972), the Kansas Supreme Court found that a purchasing corporation was not a mere continuation of the seller because there was no common ownership. Further, the seller continued as a corporate entity after the asset sale. The Court noted: "[The buyer corporation] did not come into being as a result of a reincorporation of [the selling corporation] or by amendment of the [selling corporation's] corporate charter."[5]

One case has expanded the meaning of the mere continuation exception. In *Cyr v B Offen & Co, Inc,* 501 F2d 1145 (CA 1, 1974), plaintiff was injured in 1969 while at work. He was injured by a machine

---

[5] The courts in *National Dairy Products Corp v Borden Co,* 363 F Supp 978 (ED Wis, 1973) and *Lopata v Bemis Co,* 383 F Supp 342 (ED Pa, 1974), reached the same conclusion as the courts in *Comstock, McKee* and *Kloberdanz. Lopata* approvingly quoted the test used by *National Dairy:* "The test is not the continuation of the business operation but the continuation of the corporate entity." The *Lopata* court, citing *Kloberdanz,* stated that a "mere continuation" involves "a common identity of stock, directors, stockholders and the existence of only one corporation at the completion of the transfer." (p 345.) The Court found that the selling corporation continued to exist, contrary to the mere continuation situation. But the Court held the most important factor to be that "there was no interchange of stock or change in the basic ownership of either corporation". (p 345.) Name change and dissolution a year later were held not controlling. Therefore, the mere continuation exception did not apply.

Other cases reaching essentially the same result are *Forest Laboratories, Inc v Pillsbury Co,* 452 F2d 621, 626 (CA 7, 1971), *Ortiz v South Bend Lathe,* 46 Cal App 3d 842; 120 Cal Rptr 556 (1975), *J F Anderson Lumber Co v Myers,* 296 Minn 33; 206 NW2d 365 (1973), and *Bill Hodges Truck Co v Williams,* 470 P2d 310 (Okla, 1970). *But see Alexander & Baldwin, Inc v Peat, Marwick, Mitchell & Co,* 385 F Supp 240 (SD NY, 1974) (mere continuation found, but distinguished from *Kloberdanz*).

manufactured in 1959 by B. Offen Co., a sole proprietorship of Bernard Offen. After his death, a group of employees and a 30% outside financier joined to purchase the company from the executor. The business operation was continued precisely as before, being named B. Offen & Co., Inc. B. Offen & Co., Inc., of course, argued that it could not be liable to plaintiff because it was not even in existence when the machine was manufactured.

The Court noted that the facts did not fit within the usual mere continuation case because ownership had obviously changed hands. However, the Court held that the policy reasons for strict liability in tort were cause for extension of the mere continuation exception. Those policy reasons stressed were:

"(1) the manufacturer is better able to protect itself and bear the costs while the consumer is helpless; (2) it is the manufacturer which has launched the product into the channels of trade; (3) it is the manufacturer which has violated the representation of safety implicit in putting the product into the stream of commerce; and (4) the manufacturer is the instrumentality to look to for improvement of the product's quality." *Cyr, supra,* at 1154.

The Court held that the first and fourth policy reasons for strict liability apply equally to a successor corporation carrying on the manufacture and servicing of the same product. It further noted:

"The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to

gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product." *Cyr, supra,* at 1154.

*Cyr* may be read as a redefinition of the mere continuation rule. While identical ownership might still establish the exception in a "new hat" or reincorporation situation, other factors might also be sufficient. Crucial factors to consider are whether essentially the same employees and management continue in the succeeding corporation, the same products are produced, and the same facilities are used. Use of the same name, while a factor to consider, does not seem crucial. Also important is the nature of the very continuation itself—use of goodwill and representations of continuity.

However, *Cyr* is subject to criticism. The reliance on the rationale for strict liability in tort becomes quite strained when applied to the area of corporate law. While the theory of the "deep pocket" and enterprise liability may be argued in tort law, it is out of place in corporate law and in the instant case. The *Cyr* theory as reasoned by the Court has no limits. If *Cyr* were to be followed, "deep pocket" enterprise liability theories need not, in future cases, depend on the particulars of the acquisitions involved—but would tend to be carried as far as the emotions demand.

Basically, the *Cyr* approach overlooks the importance of ownership in a corporation. Responsibility for disposition of the assets of a corporation ultimately rests with its owners, the shareholders. They must respond financially to claims of negli-

gence. If ownership has changed by purchase since the act of negligence occurred, the succeeding owner is not liable, without more. While the new owner might be strictly liable under one of the exceptions to the general rule of nonliability, the reasons for strict liability are not appropriate as a fifth exception to the general rule.[6]

There is no doubt that the instant facts present a terrible situation. It is certainly no solace to plaintiff that his position is not different from one with a claim against a corporation that has simply dissolved, leaving nothing behind. However, distortion of the law is ill advised. If the Legislature wishes to impose assumption of all liabilities by operation of law on the purchaser in a sale of all assets, it may do so, eliminating the need for a distortion of the de facto merger doctrine. Rather than extend the mere continuation exception by use of tenuous analogies imported from tort law, a comprehensive legislative approach to the problem is recommended.

Defendant planned this acquisition under long established law. Because there was a definite change in ownership in the instant case, the mere continuation exception does not apply.

## V. THE ASSUMPTION OF LIABILITIES EXCEPTION

It has long been true that an express or implied agreement to assume a selling corporation's liabilities will impose liability upon the buying corporation. 15 Fletcher, Private Corporations, §§ 7114, 7115, 7122, 7124. Many cases have discussed this exception, including several recent cases with facts

---

[6] Moreover, *Cyr* presents a unique fact situation where the employees purchased the corporation, continuing its operations as before the purchase. This factor may have persuaded the court to look for a way around the general rule.

similar to the instant case.[7] However, the cases are not useful for discussion of the instant matter because the result depends on the precise language and nature of the assumption agreement. The instant facts are unique and require application of law on the interpretation and construction of contracts.

Assumption of liabilities is mentioned in six places, five of which are in the April 13 purchase agreement and the other in the May 1 assumption of liabilities document.

In section 1 of article I of the April 13 agreement, Harris (or its subsidiary) agreed to buy Sheridan's (1903) assets, subject to liabilities assumed in section 3. In section 2 of article I, Harris (or its subsidiary) agreed to assume all liabilities of Sheridan (1903) except as provided in section 3 as partial consideration for the sale. In section 3, Harris (or its subsidiary) agreed to "assume all liabilities of Sheridan [1903] existing on the Closing Date * * * ". Certain specific exceptions followed which are not of importance here. In the same section 3, the agreement provided that if Sheridan (1903) paid any liabilities before the closing date which were not assumed by Harris, then the cash price would be correspondingly reduced. In section 4 of article IV, Harris (or its subsidiary) agreed to give Sheridan (1903) an instrument of assumption assuming "liabilities of

[7] Cases finding no assumption are *Oak Distributing Co v Miller Brewing Co,* 370 F Supp 889 (ED Mich, 1973), *Kloberdanz v Joy Manufacturing Co,* 288 F Supp 817 (D Colo, 1968), *Ortiz v South Bend Lathe,* 46 Cal App 3d 842 (1975), *Pulsnation Enterprises, Inc v Appliance Plan Co,* 141 So 2d 814 (Fla App 1962), and *McKee v Harris-Seybold Co,* 109 NJ Super 555; 264 A2d 98 (1970). Cases finding assumption are *Turnbull, Inc v Commissioner of Internal Revenue,* 373 F2d 91 (CA 5, 1967), and *Campbell v Hickory Farms,* 258 SC 563; 190 SE2d 26 (1972). Many older cases discuss assumption agreements. *See* cases cited in 15 Fletcher, Private Corporations, §§ 7114, 7115, 7122, 7124.

Sheridan [1903] which are to be assumed by Harris or the Subsidiary pursuant to this Agreement * * * ". This refers to section 3 of article I which contains the actual assumption agreement in the April 13 purchase agreement. The document to be given was the May 1 document. Finally, the "Assumption of Liabilities" document was executed on the closing date. The document was signed only by Sheridan (1964) while the purchase agreement was signed by both Harris and Sheridan (1903). It provides:

> *"Pursuant to the provisions of Article I of the Agreement dated April 13, 1964,* between Harris-Intertype Corporation and T. W. & C. B. Sheridan Company, a New York corporation incorporated in 1903 (hereinafter called 'Old Sheridan') the undersigned T. W. & C. B. Sheridan Company, a New York corporation incorporated in 1964 (hereinafter called 'New Sheridan') the Subsidiary referred to in said agreement, which has been designated by Harris-Intertype Corporation to acquire the assets of Old Sheridan, *hereby assumes and agrees to pay, perform and discharge all debts, obligations, contracts and liabilities of Old Sheridan of any kind, character or description, whether accrued, absolute, contingent or otherwise, as reflected on the balance sheets, books of account and other records of Old Sheridan on the date hereof * * * ."* (Emphasis added.)

Certain exceptions then follow, being the same as listed in article I of the purchase agreement.

Use of several rules of construction is necessary to give meaning to the agreement. "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties."[8]

---

[8] *McIntosh v Groomes,* 227 Mich 215, 218; 198 NW 954 (1924); *Sobczak v Kotwicki,* 347 Mich 242; 79 NW2d 471 (1956); *Piasecki v Fidelity Corp,* 339 Mich 328; 63 NW2d 671 (1954); *McCastle v Scanlon,* 337 Mich 122; 59 NW2d 114 (1953); *Klever v Klever,* 333 Mich 179; 52 NW2d 653 (1952); *Biltmore Land Co v Munro's Estate,* 271 Mich 125;

It is well settled that the court, not the jury, interprets a contract where there is no ambiguity.[9] If there is an ambiguity, it is still true, "as a general rule, that the construction of written instruments belongs to the court, and not to the jury".[10] But, admittedly there are cases where the court is not able to ascertain intent, and the jury is more appropriate—the several cases following this rule have involved situations where extrinsic facts were crucial to the construction of the contract.[11] But the general rule was stated by *Tompkins v Gardner & Spry Co,* 69 Mich 58; 37 NW 43 (1888):

"It is the duty of courts and not juries to construe written contracts, and define what is and what is not within their terms."

It is equally well settled that there should be no construction of a contract to find intent if it is clear and unambiguous.[12]

---

260 NW 135 (1935); *Kellogg v Kellogg Toasted Corn Flake Co,* 212 Mich 95; 180 NW 397 (1920); *Kunzie v Nibbelink,* 199 Mich 308; 165 NW 722 (1917).

[9] *Hewett Grocery Co v Biddle Purchasing Co,* 289 Mich 225; 286 NW 221 (1939); *Detroit v Porath,* 271 Mich 42; 260 NW 114 (1935); *Muir v Leonard Refrigerator Co,* 269 Mich 406; 257 NW 723 (1934); *Joseph v Rottschafer,* 248 Mich 606; 227 NW 784 (1929), *Cutler v Spens,* 191 Mich 603; 158 NW 224 (1916).

[10] *Cutler, supra,* at 615.

[11] *See Hewett Grocery Co v Biddle Purchasing Co,* 289 Mich 225; 286 NW 221 (1939), *Stevenson v Michigan Log Towing Co,* 103 Mich 412; 61 NW 536 (1894); *Crane Lumber Co v Otter Creek Lumber Co,* 79 Mich 307; 44 NW 788 (1890); 6 Mich Law & Practice, Contracts, § 147.

[12] *Hank v Lamb,* 310 Mich 81; 16 NW2d 671 (1944), *Michigan Chandelier Co v Morse,* 297 Mich 41; 297 NW 64 (1941), *Ginsberg v Reliable Linen Service Co,* 292 Mich 70; 290 NW 331 (1940), *Dunn v Detroit Federation of Musicians, Local No 5,* 268 Mich 698; 256 NW 581 (1934), *Harrington v Inter-state Business Men's Accident Association,* 210 Mich 327; 178 NW 19 (1920).

A contract should be construed as a whole, giving effect to all provisions; the literal sense of certain words should not interfere with interpretation of the contract as a whole.[13]

In construing a contract, the court may consider circumstances existing at time of execution, in addition to subject matter and purpose of the contract.[14]

Words should be given their ordinary meanings.[15]

Language in a contract may be strictly construed against its drafter if there is an ambiguity.[16]

When several instruments are involved, they

[13] *First Baptist Church v Solner*, 341 Mich 209; 67 NW2d 252 (1954), *W O Barnes Co v Folsinski*, 337 Mich 370; 60 NW2d 302 (1952), *Singer v Goff*, 334 Mich 163; 54 NW2d 290 (1952), *Klever, supra, Staebler-Kempf Oil Co v Mac's Auto Mart, Inc*, 329 Mich 351; 45 NW2d 316 (1951), *Johnston v Miller*, 326 Mich 682; 40 NW2d 770 (1950), *Moulton v Lobdell-Emery Manufacturing Co*, 322 Mich 307; 33 NW2d 804 (1948), *Cousins v Melvin F Lanphar & Co*, 312 Mich 715; 20 NW2d 783 (1945), *Nelson v Big Rapids Gas Co*, 299 Mich 284; 300 NW 89 (1941), *McIntosh, supra, Thomson Electric Welding Co v Peerless Wire Fence Co*, 190 Mich 496; 157 NW 67 (1916).

[14] *Detroit Greyhound Employees Federal Credit Union v Aetna Life Insurance Co*, 381 Mich 683; 167 NW2d 274 (1969), *W J Howard & Sons, Inc v Meyer*, 367 Mich 300; 116 NW2d 752 (1962), *Stimac v Wissman*, 342 Mich 20; 69 NW2d 151 (1955), *First Baptist Church, supra, Piasecki v Fidelity Corp*, 339 Mich 328; 63 NW2d 671 (1954), *MacNicol v Grant*, 337 Mich 309; 60 NW2d 290 (1953), *Gee v Olson*, 320 Mich 274; 30 NW2d 867 (1948), *Detroit Grand Park Corp v Turner*, 316 Mich 241; 25 NW2d 184 (1946), *Shirey v Camden*, 314 Mich 128; 22 NW2d 98 (1946), *Taylor v Taylor*, 310 Mich 541; 17 NW2d 745 (1945), *Hustina v Grand Trunk Western R Co*, 303 Mich 581; 6 NW2d 902 (1942), *Thomas v Jewell*, 300 Mich 556; 2 NW2d 501 (1942), *Milligan v Haggerty*, 296 Mich 62; 295 NW 560 (1941), *Moore v Kimball*, 291 Mich 455; 289 NW 213 (1939), *Carter v Marvel Carburetor Co*, 269 Mich 21; 256 NW 608 (1934), *Draper v Nelson*, 254 Mich 380; 236 NW 808 (1931), *McIntosh, supra, Murray v Kator*, 221 Mich 101; 190 NW 667 (1922).

[15] *New Amsterdam Casualty Co v Sokolowski*, 374 Mich 340; 132 NW2d 66 (1965), *Stott v Stott Realty Co*, 306 Mich 492; 11 NW2d 215 (1943), *Hall v Equitable Life Assurance Society*, 295 Mich 404; 295 NW 204 (1940).

[16] *Bonney v Citizens' Mutual Automobile Insurance Co*, 333 Mich 435; 53 NW2d 321 (1952), *Seaboard Surety Co v Bachinger*, 313 Mich 174; 20 NW2d 854 (1945), *Michigan Chandelier Co, supra*.

may be read together.[17]

The rules of construction must be applied to two documents, as above set forth—the April 13 purchase agreement and the May 1 assumption of liabilities drawn and signed by Sheridan (1964).

In the April 13 document each mention of assumption of liabilities, as above set forth, is keyed into section 3 of article I. Even section 4 of article IV, providing that Harris or its designated subsidiary will give Sheridan (1903) a document of assumption, is keyed into section 3 of article I. At least as far as the April 13 purchase agreement is concerned, section 3 states what liabilities are assumed: "Harris or the Subsidiary shall assume all the liabilities of Sheridan [1903] existing on the Closing Date * * * ."

Looking at this provision alone, and using the rule that words should be given their ordinary meanings, the April 13 purchase agreement does not manifest intent to assume liabilities arising after the May 1 closing date. Use of the closing date as a cutoff manifests intent against taking on responsibility for future claims, such as that of plaintiff. Intent of the parties is foremost in interpreting contracts. While the word "liability" when used alone may possibly be read to include contingencies and future eventualities, the phrase "existing on the Closing Date" clearly limits the assumption to liabilities in existence as of May 1. Plaintiff's claim did not arise until four years later.

However, the May 1 assumption document complicates this clear reading of the agreement. It states that Sheridan (1964) will assume all liabilities "whether accrued, absolute, contingent or otherwise, as reflected on the balance sheets, books of

---

[17] *Deane v Rex Oil & Gas Co,* 325 Mich 625; 39 NW2d 204 (1949).

account and other records of Old Sheridan on [May 1] * * * ." This would seem to broaden the assumption in the April 13 agreement, introducing an ambiguity. Thus, construction is necessary.

Assuming that the April 13 and May 1 documents may be read together despite the fact that only Sheridan (1964) signed the May 1 document (it should be noted that section 4 of article IV of the purchase agreement provided for Sheridan [1964] giving an assumption document) we must search for intent of the *contracting parties,* Harris and Sheridan (1903). Two rules are of utmost importance here. (1) A contract should be construed as a whole, giving effect to all provisions, and the literal sense of certain words should not interfere with interpretation of the contract as a whole, and (2) in construing a contract, the court may consider circumstances existing at time of execution, in addition to subject matter and purpose of the contract.

It is quite clear that the contracting parties did not intend to extend the scope of the April 13 assumption by the May 1 document. While the literal sense of the May 1 assumption indicates a broader scope, we must construe the contract as a whole. We cannot forget the fact that every mention of liability assumption in the April 13 agreement signed by both parties keys into the limited section 3 assumption. Moreover, the very provision which requires Sheridan (1964) to provide the ambiguous and disputed document of assumption states that the assumption should be keyed into the limited section 3 assumption. Section 4 of article IV provides that the May 1 assumption document shall be "pursuant to this Agreement", meaning the April 13 purchase agreement signed by both parties. This can only refer to section 3.

Also, looking at the circumstances and purpose of the contract, the parties did not intend for Harris or Sheridan (1964) to assume future and contingent liabilities. As defendant states, the contract for the asset sale involved here is very detailed. Harris wanted to calculate, as near as possible, the net worth of Sheridan (1903). Only by doing this can Harris determine that it is paying its money for a valuable set of assets having net worth, or a set of assets having net liabilities. This was the intent and purpose of the contract. If Harris were to assume future, contingent, and unknown liabilities, it could never ascertain whether it was buying a plus or a minus. Thus it is contrary to the intent of the contracting parties. It is quite true that Harris could never *precisely* figure Sheridan's (1903) net worth because there is always the risk that some assets will end up being worth a little less, or perhaps a little more, than originally calculated. But the calculation should be close while such future, contingent liability is wholly speculative.[18]

Sheridan (1964) and Harris did not assume liability for plaintiff's product liability claim.

---

[18] Examination of the purchase agreement discloses several provisions aimed at assuring Harris of purchasing net worth:

1. If Sheridan (1964) or Harris paid any nonassumed liabilities before the closing date, the purchase price was to be reduced by an equal amount.

2. Financial reports were required to fairly represent the financial position of Sheridan (1903).

3. Sheridan (1903) was sharply limited on stock redemptions and declaration of dividends.

4. Sheridan (1903) was required to have good title to all assets.

5. Sheridan (1903) covenanted that it was not subject to litigation not covered by insurance.

6. Sheridan (1903) covenanted that there were no changes in assets or liabilities, other than in ordinary business.

7. Sheridan (1903) covenanted that none of its assets had been affected by fire, earthquake, etc.

8. Sheridan (1903) covenanted that it had not encumbered any of its assets.

9. Sheridan (1903) was sharply limited in payment of salaries.

We would affirm the trial court's finding of no liability.

FITZGERALD, J., concurred with COLEMAN, J.